UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>*ex rel.* J. DAVID JOHN, )<br> )<br>     Plaintiff and Relator, )<br> )<br>     v. )<br> )<br>J. DENNIS HASTERT, )<br> )<br>     Defendant. ) | 13 C 5014 |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on the motion of Defendant J. Dennis Hastert ("Hastert") to dismiss the amended complaint brought by Plaintiff J. David John ("John") pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 9(b). For the reasons set forth below, the motion is granted.

## BACKGROUND

### I. Facts

The following are allegations in John's amended complaint, many of which were recited in the Court's previous opinion. *See U.S. ex rel. John v. Hastert*, No. 13 C 5014, 2014 WL 4652662 (N.D. Ill. Sept. 18, 2014). John is a resident of Burr Ridge, Illinois. Hastert is a resident of Yorkville, Illinois ("Yorkville"). Both former

college wrestlers, John and Hastert knew each other from their student athlete days at Wheaton College.

### A. The Former Speaker Statute and the MRA Handbook

Hastert is the former speaker (the "Former Speaker") of the United States House of Representatives (the "House"). Upon his retirement from the House, Hastert opened an office in Yorkville (the "Office") as is permitted under 2 U.S.C. § 31b-1 to 31b-7 (reclassified as 2 U.S.C. §§ 5125-29) (the "Former Speaker Statute"). The Former Speaker Statute, 2 U.S.C. § 31b-2, states that upon retirement the former Speaker of the House is permitted:

> "an allowance equal to the Members' Representational Allowance (to be paid in the same manner as such Allowance) for the office and other expenses incurred in connection with the administration, settlement, and conclusion of matters pertaining to or arising out of his incumbency in office as a Representative in Congress and as Speaker of the House of Representatives."

Hastert kept the Office for exactly five years as permissible by the House rules. Hastert was given an allowance for the Office equal to a Congressional Member's Representational Allowance ("MRA") for the Office's expenses. *See* 2 U.S.C. § 31b-2. He was provided with staff, including an administrative assistant and two secretaries. *See* 2 U.S.C. § 31b-5. John attaches 144 pages of disbursement statements to the amended complaint, compiled by the Chief Administrative Office and sent to Hastert (the "Disbursement Statements").

According to the Members' Representation Allowance Handbook (the "MRA Handbook"):

"Ordinary and necessary expenses incurred by the Member or the Member's employees . . . are reimbursable in accordance with the regulations contained in [the] Members' Congressional Handbook. . . [d]isbursements from the MRA are made on a reimbursement or direct payment basis and require specific documentation and Member certification as to accuracy and compliance with applicable federal laws, House Rules, and Committee regulations."

"Ordinary and necessary" expenses are defined as:

"reasonable expenditures in support of official and representational duties to the district from which he or she is elected that are consistent with all applicable federal laws, Rules of the House of Representatives and regulations of the Committee on House Administration."

Hastert allegedly submitted vouchers to the House every fiscal quarter from 2008 through 2012 for reimbursement of various expenses, including the Office's rent, the Office's equipment and supplies, the salaries of his three employees, the lease and expenses of the GMC Yukon (the "Yukon"), consulting and legal fees, and other miscellaneous expenses. These vouchers supposedly contained supporting documentation (receipt, lease, bills, etc.) and Hastert's signature.

## B. Allegations of Private Business Dealings

### 1. The Office

From 2008 to 2012, John engaged in a variety of business ventures with companies, including ESPN and Interstate, to organize a professional golf tournament in the Middle East and to develop a Formula One racetrack and technology park in California. John alleges that he worked with Hastert on these private business ventures. John claims that he worked with Hastert on the Wheaton College wrestling team, fundraising for the J. Dennis Hastert Center for Economics, Government and

Public Policy (the "Hastert Center"), other personal projects, and social affairs. All John's interactions with Hastert were coordinated through the Office's phone, mail, email, (sent to either the Office or through the domain @formerspeaker.org) and Hastert's mobile phone issued from the Office. John attaches seven emails from one of Hastert's employees, sent between October 2008 and February 2009. These emails discussed, among other things, directions to the Office for a meeting with Hastert, scheduling meetings between John and Hastert, travel arrangements for Hastert, and a meeting with an Ambassador regarding the golf tournament in the Middle East.

At the same time he ran the Office, Hastert was also employed by the lobbying firm, Dickstein Shapiro, which lobbies for companies, including the Chicago Mercantile Exchange, The Servicemaster Company, HR Green, Polybrite and Centerpoint. John alleges that he hired Hastert to perform consulting and lobbying services for various existing and future projects.

### 2. The Employees

The Office employed three employees, Lisa Post ("Post"), Bryan Harbin ("Harbin"), and Thomas Jarman ("Jarman"). John claims that Hastert regularly used his employees to make arrangements for, do research for, and coordinate with third parties concerning Hastert's private business dealings. For instance, John claims that Jarman was primarily involved with the Hastert Center. John attaches a House "Report of the Committee on Standards of Official Conduct The Matter of Representative Charles B. Rangel" ("Rangel Report"), which states that activities

regarding the establishment and development of such establishments like the Hastert Center are not a legitimate use of MRA funds. John also alleges that he observed Hastert's employees working on Hastert's lobbying business and other personal business ventures. Providing no specific details, John alleges that Hastert's employees reported to him that all business-related matters pertaining to the Former Speaker were completed in 2008.

### 3. The Yukon

John asserts that Hastert's Yukon was mainly used for Hastert's personal use and private business deals. John alleges that Hastert and Jarman used the Yukon to drive to St. Louis to attend the NCAA Division I Wrestling championships held March 19th to the 21st of 2009. John also claims that Post or Harbin would drive Hastert in the Yukon to private business matters, including to deals John was involved with. John alleges that Hastert submitted quarterly vouchers to the House for reimbursement of the full expenses of the Yukon, including lease and fuel payments.

### 4. Other Alleged Violations

Because of his business and social relationship with Hastert, John alleges that he was in a position to observe how Hastert conducted business at the Office. For example, John states that in September 2010, Hastert asked John to contact brokers on his behalf to obtain bids on purchasing an annuity, which would create $70,000 in annual income for Hastert. John and his partners also paid airfare, transfers, hotels, meals and other expenses for Hastert when he traveled with them to work on special

deals in Singapore, Montreal, California, Florida, Washington, D.C., Chicago and Saudi Arabia. Although Hastert occasionally used stationary with the heading "Hastert & Associates," John alleges that the address on the letters was linked to Hastert's client, HR Green, and Hastert did not have a phone, email access or staff at that location. Hastert used his official Office letterhead to correspond with potential business partners and for personal letters on behalf of John. Furthermore, when Hastert attended these meetings with John, he used his business cards from the Office to provide contact information. John claims that Hastert submitted reimbursement for consulting and legal fees that were not permitted under the Former Speaker Statute.

## II. Procedural History

On November 20, 2014, John filed an amended two-count complaint alleging that Hastert: (i) violated the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* when he submitted false signed and certified vouchers for reimbursement of expenses (Count I); and (ii) caused violations of the FCA by certifying each voucher while knowing that they were false (Count II). John asks this Court to enter judgment against Hastert: (i) in favor of the United States of America for the Office, operational expenses and salaries paid for the Office during 2008, 2009, 2010, 2011, and 2012, and triple the amount of the judgment pursuant to the FCA; (ii) in favor of the United States of America, for $5,000 to $11,000 for each monthly claim or claims submitted for expenses and salaries relating to the Office in violation of the FCA; (iii) in favor of

John for a percentage of the total amount of the judgment against Hastert pursuant to 31 U.S.C. § 3730, *et seq*. ("Section 3730"); and (iv) any other appropriate relief.

On January 6, 2015, Hastert moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"), 12(b)(6) ("Rule 12(b)(6)") and 9(b) ("Rule 9(b)").

## LEGAL STANDARDS

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint and not the merits of the case. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 878 (7th Cir. 2012). The allegations in a complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff need not provide detailed factual allegations but must provide enough factual support to raise her right to relief above a speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim must be facially plausible, meaning that the pleadings must allow the court to draw the reasonable inference that the defendant is liable for the purported misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claims must be described "in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests." *EEOC v. Concentra Health Services*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss under Rule 12(b)(6). *Id.* at 678.

A motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges a court's subject matter jurisdiction. An objection presented by a Rule 12(b)(1) motion challenging the court's subject matter jurisdiction is that the court has no authority or competency to hear and decide the case before it. *International Union of Operating Engineers Local 150, AFL-CIO v. Ward*, 563 F.3d 276, 280-82 (7th Cir. 2009).

Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The False Claims Act "is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b)." *U.S. ex rel. Gross v. AIDS Research Alliance–Chicago*, 415 F.3d 601, 604 (7th Cir. 2005) (citation omitted). A complaint satisfies Rule 9(b) when it alleges "the who, what, when, where, and how: the first paragraph of a newspaper story." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).

While the circumstances constituting fraud must be pleaded with particularity, a defendant's "[m]alice, intent, knowledge [or] other condition of mind ... may be averred generally." Fed. R. Civ. P. 9(b). A plaintiff who provides a "general outline of the fraud scheme" sufficient to "reasonably notify the defendants of their purported role" in the fraud satisfies Rule 9(b). *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992). When details of the fraud itself "are within the defendant's exclusive knowledge," specificity requirements are less stringent. *Jepson, Inc. v.*

*Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994). Rule 9(b)'s heightened pleading standard derives from "the potential stigmatic injury that comes with alleging fraud" and the desire to discourage a "sue first, ask questions later" approach to fraud litigation. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011).

## DISCUSSION

Hastert brings this motion under three separate legal standards. First, Hastert argues that pursuant to Rule 12(b)(1), this Court lacks subject matter jurisdiction under the public disclosure bar. Second, Hastert also brings this motion under Rule 12(b)(6) for failure to state a claim on which relief can be granted. Third, he argues that John has failed to meet the heightened pleading standard under Rule 9(b).

## I. Legal Sufficiency of John's Amended Complaint Under Rule 9(b)

The FCA imposes liability against any person or entity that "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)-(2). To establish civil liability under the FCA, a relator generally must prove: (i) that the defendant made a statement in order to receive money from the government; (ii) that the statement was false; and (iii) that the defendant knew the statement was false. 31 U.S.C. § 3729(a)(2); *U.S. ex rel. Hill v. City of Chicago*, 08 C 4540, 2014 WL 123833, at *6 (N.D. Ill. Jan. 14, 2014). Moreover, "[a]n FCA claim premised upon an

alleged false certification of compliance with statutory or regulatory requirements []
requires that the certification of compliance be a condition of or prerequisite to
government payment." *Gross*, 415 F.3d at 604. "To say fraud has been *pleaded* with
particularity is not to say that it has been *proved* (nor is proof part of the pleading
requirement)." *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 855 (7th Cir.
2009).

### A. Certification of Compliance to Government As a Condition of Payment and Hastert's Knowledge of the False Vouchers

Hastert avers that John fails to satisfy the first element, that Hastert made a
statement (in the form of a certified claim) in order to receive money from the
government. Hastert argues that John does not identify "a single express false
statement" made by Hastert or allege that certification of compliance by Hastert was a
condition of or prerequisite to government payment in this case. *See Gross*, 415 F. 3d
at 604 (holding that plaintiff's second amended complaint failed because it did not
allege that payment by the government was conditioned upon certification of
regulatory compliance). Because Hastert actually received reimbursements, John
argues that such certifications to obtain these reimbursements must have been false.
Hastert disagrees, and argues that such certification was not specifically required
under the Former Speaker Statute and that the MRA Handbook only applies to *sitting*
members of Congress, not a *former* speaker like Hastert.

It is true that the John fails to identify any specific statements made by Hastert to the government, but the Seventh Circuit has allowed a relator to infer that a false statement was made, provided "the inference . . . is a plausible one" and is pleaded with the required specificity. *Lusby*, 570 F.3d at 854. Moreover, at this early stage of litigation, the Seventh Circuit has found that "a relator need not produce a copy of the actual document making the false claim." *Leveski v. ITT Educ. Servs.*, 719 F.3d 818, 838 (7th Cir. 2013). The relator must still "show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy." *Lusby*, 570 F.3d at 854-55.

Notably, there is an alternative to express certification, known as implied certification, discussed by the Seventh Circuit in *U.S. ex rel. Grenadyor v. Ukr. Vill. Pharm., Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014). The implied certification theory "treats a bill submitted to the government as an implicit assurance that the bill is a lawful claim for payment, an assurance that's false if the firm submitting the bill knows that it's not entitled to payment." *Grenadyor*, 772 F.3d at 1106. The Court notes that, as recently as December 2014 when *Grenadyor* was decided, the Seventh Circuit still classifies the implied certification theory as "unsettled by [this] court." *Id.* However, in *Grenadyor* the Seventh Circuit did accept implied certification as valid for the purposes of concluding that the plaintiff in *Grenadyor* failed to allege "conduct within the scope of the theory with sufficient specificity to satisfy Rule 9(b)." *Id.*

- 11 -

Similar to *Lusby*, it seems as though John attempts to infer that Hastert made statements "for every fiscal quarter for the years 2008 through 2012" based on the fact that he actually received reimbursements for the Office and other expenses shown in the Disbursement Statements.   Contrary to Hastert's argument that John does not allege that Hastert was required as a condition of payment to accompany each invoice with a certification of compliance with the Former Speaker Statute, John does allege in his amended complaint that ". . . Hastert was required to sign and certify that each expense was incurred in support of his official duties."  In his response to the instant motion, John explains further that this certification derives from the Former Speaker Statute and the MRA Handbook being read in conjunction with one another.  John contends that because the Former Speaker Statute states that Hastert's allowance must be paid "in the same manner" as the MRA, it means that Hastert must have certified that the expenses, for which he sought reimbursement for, were incurred in support of "the administration, settlement, and conclusion of matters pertaining to or arising out of his incumbency in office . . ."

The Court finds the following arguments made by Hastert unavailing: (i) that Hastert did not make a statement to the government; and (ii) that John did not properly allege that certification of compliance by Hastert was a prerequisite to government payment.  Hastert's reimbursements were to be paid in the same manner as the MRA Handbook, which outlined that the Member must *certify*, with specific documentation as to accuracy and compliance with applicable federal laws, rules and

regulations, that the expenses were generated from the Member's official duties. Only then would reimbursements be made. Just because the Former Speaker statute does not expressly state that certification is necessary does not negate the necessity of such certification detailed in the corresponding MRA Handbook. The Court holds that the Former Speaker Statute incorporates the requisite certification required in the MRA Handbook. Thus, based on the allegations, we find that John has sufficiently pleaded a plausible inference that a statement was made by Hastert, in the form of certification, as a prerequisite for his receipt of the reimbursements.

As to the third element, that Hastert knew the vouchers were false, when certification is a prerequisite to obtaining a government benefit, knowledge can be shown through certification of false statements. *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 824 n. 4 (7th Cir. 2011). John alleges that Hastert knew his vouchers for reimbursement did not comply with the Former Speaker Statute's requirement, and supplies examples, including that Hastert knew the use of the Office, its equipment and supplies, his Yukon, and his three employees for his private business ventures were not for the purpose of "the administration, settlement, and conclusion of matters pertaining to or arising out of his incumbency in office as a Representative in Congress and as Speaker of the House of Representatives." Because John properly alleges, and the MRA Handbook mandates that certification of compliance with applicable federal laws, rules and regulations was a prerequisite to

government payment for Hastert's allowance, the Court holds that the third element is satisfied. The falsity of the statements is discussed further below.

### B. Falsity of Vouchers

As to the second element, Hastert argues that John has, yet again, failed to plead his fraud claims with particularity as required under Rule 9(b). The real question is whether John has properly satisfied Rule 9(b) by establishing that Hastert's certifications of compliance with the Former Speaker Statute (and the applicable sections of the MRA) were false. The Seventh Circuit reminded us in *Grenadyor* that "[v]iolating a regulation is not synonymous with filing a false claim" and that an alleged violation of law does not create a cause of action under the FCA without a false certification of compliance. *Grenadyor*, 772 F.3d at 1107.

A relator must "identify specific false claims for payment or specific false statements made in order to obtain payment." *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003). For each alleged false statement, the relator must plead "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated . . . ." *See Grenadyor*, 772 F.3d at 1106 (citation omitted). However, because John claims that Hastert's allegedly fraudulent scheme lasted for a period of four years, "[a] plaintiff who pleads a fraudulent scheme involving numerous transactions over a period of years need not plead specifics with respect to every instance of fraud, but he must at least provide representative examples." *See*

- 14 -

*Mason v. Medline Indus., Inc.*, 731 F.Supp.2d 730, 735 (N.D. Ill. 2010) (where the court found that the complaint satisfied Rule 9(b) because the plaintiff gave "concrete examples, identifying the individuals and businesses involved, the relevant time frames, and the manner in which the bribes or kickbacks were paid").

It is our responsibility to excise from the complaint any legal conclusions or conclusory allegations that are not entitled to the presumption of truth. *McCauley v. City of Chi.*, 671 F.611, 616 (7th Cir. 2011). The Court notes that the amended complaint does contain some conclusory and inartfully pleaded allegations, including, but not limited to: (i) Hastert was reimbursed for the full rent of the Office "while using it mainly for his private businesses;" (ii) ". . . 90% of the [Office's] expenses were related to Mr. Hastert's non-governmental, personal business ventures;" (iii) Hastert was reimbursed for employees' salaries even though their activities "were not related to concluding the affairs of Mr. Hastert as Former Speaker;" (iv) "all business-related matters pertaining to the Former Speaker were completed in 2008;" (v) Hastert submitted vouchers "which were NOT ordinary and necessary of the Office of the Former Speaker of the House for private business matters;" (vi) "[u]se of the [Office] and the time for these private business meetings were not related to concluding the affairs of Mr. Hastert as Former Speaker;" and (vii) "[t]he reality is that Mr. Hastert had very little time to devote to concluding the affairs as Former Speaker." Disregarding these conclusory allegations, the Court now accesses the remaining allegations in the amended complaint to determine whether John has

sufficiently pleaded a fraudulent scheme by alleging information that you would expect to find in "the first paragraph of a newspaper story." *See Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 815 (N.D. Ill. 2013).

### 1. "Who"

John alleges that Hastert submitted the allegedly false vouchers for every fiscal year for the years 2008 through 2012. John names Post, Jarman and Harbin as the three employees whose salaries were paid for by the government, even though Hastert allegedly used his employees to make arrangements, do research, and coordinate with third parties for Hastert's private business dealings. John attaches email correspondence with Post using her email address ending in "@formerspeaker.org." Although John does not detail whether Post, Jarman or Harbin assisted in submitting the allegedly false vouchers, none of them are listed as defendants. *See Pirelli*, 631 F.3d at 446 (7th Cir. 2011) ("[T]he district court was incorrect when it suggested that [plaintiff] need[ed] to point to specific misrepresentations made by particular [employees of defendant]."). The Court, therefore, finds that the amended complaint alleges sufficient facts as to the "who" inquiry because it identifies Hastert as the person who allegedly made and submitted the false vouchers to the government.

### 2. "Where"

John contends that the private business dealings occurred both at the Office and outside the Office. As to where the vouchers were produced and certified, John provides enough detail to infer that the misrepresentations were submitted somewhere

in Illinois, presumably from the Office. However, the Court prefers more specificity. The Court also infers that the employees who were allegedly working on private business dealings were doing so at the Office. With respect to where the vouchers were submitted to, John does not explicitly state the address they were sent to, but he does provide the Disbursement Statements. On these attached statements, John marked the salaries of Post, Harbin, and Thomas, rent for the Yorkville Office, the Yukon's lease, mobile phone, the Office equipment, and other miscellaneous expenses. These statements establish that documentation was submitted to someone working for the House who was responsible for collecting the vouchers. Considering these allegations collectively, the amended complaint contains sufficient facts as the location of the alleged fraudulent scheme.

### 3. "When"

Hastert argues that John cites to only three meetings with Hastert at the Office, and does not support his conclusory allegation that the Office was "mainly" used for private business during the five year period. The amended complaint provides the three dates, October 2, 2008, November 7, 2008 and February 2, 2009, when John had private meetings with Hastert at the Yorkville Office. While the amended complaint does lack the specific dates that Hastert submitted the vouchers, the Court does not expect him to know such at this time. *See Leveski*, 719 F.3d at 838. Since John claims that the allegedly fraudulent scheme lasted for a period of four years, he only

needs to provide specific examples, of the alleged fraud, summarized below, throughout that time period to satisfy Rule 9(b).

### 4. "What" & "How"

John is required by the Seventh Circuit to provide a general outline of a fraudulent scheme and detailed representative examples. *See Goldberg*, 929 F. Supp. 2d at 821-22 (collecting cases). The Court finds much overlap with *what* the fraudulent scheme consisted of and *how* Hastert allegedly acted fraudulently when carrying out the scheme. John alleges that the scheme involved Hastert submitting vouchers to the government every fiscal quarter from 2008 through 2012 for reimbursement of the Office's rent, the Office's equipment and supplies, the salaries of his three employees, the lease and expenses of the Yukon, and other miscellaneous expenses. John claims that the vouchers contained supporting documentation (receipt, lease, bills, etc.) and Hastert's signature; however the expenses contained in the vouchers were not used to conclude affairs remaining from his days as Former Speaker. John outlines an entire section in his amended complaint on the method to receive reimbursements, including the MRA Handbook, which shows the necessity for specific documentation and certification as to the accuracy and compliance with applicable federal laws, rules and regulations. *See U.S. ex rel. Upton v. Family Health Network, Inc.*, 900 F.Supp.2d 821, 833 (N.D. Ill. 2012) (Relators' "inability to provide the certifications' dates, identification numbers, or verbatim content does not preclude them from adequately pleading a false claim."). Below are John's representative

examples exhibiting just how the vouchers that were submitted to the House were not for expenses in connection "with the administration, settlement, and conclusion of matters pertaining to or arising out of his incumbency in office as a Representative in Congress and as Speaker of the House of Representatives."

### a. Office

John provides an illustration of how Hastert's Office was allegedly used for private business dealings. For instance, John states that he met with Hastert at the Office on three occasions in 2008 and 2009, providing the exact dates. At these meetings, John alleges that he and Hastert discussed personal business ventures, including organizing a professional golf tournament in the Middle East, developing a Formula One racetrack and technology park in California, fundraising for the Hastert Center, working together on the Wheaton College wrestling team, and other personal projects and social affairs. Hastert would also use his business cards from the Office to provide contact information during these private meetings. John claims to call Hastert on his mobile phone issued from the Office and would email Hastert's staff in an effort to coordinate meetings and such with Hastert through their "@formerspeaker.org" email addresses. John alleges that Hastert's stationary with "Hastert & Associates" was linked to Hastert's client, HR Green, and that Hastert did not have a phone, email access or staff at the address on the stationary. Likewise, John attaches a signed letter to the amended complaint on Hastert's Office letterhead and written by Hastert on behalf of John.

### b. Employees

John states that Hastert submitted vouchers for the salaries of Post, Jarman, and Harbin to the House for reimbursement. The non-conclusory allegations in the amended complaint provide the names of the employees, what types of Hastert's personal projects they allegedly worked on at the Office, and the physical emails from Post that discussed, amongst other things, directions to the Yorkville Office for a meeting with Hastert, scheduling meetings between John and Hastert, travel arrangements for Hastert, John and Jarman to California, and a meeting with an Ambassador. Additionally, John attaches the Rangel Report to show that the work on the Hastert Center performed by his employees was not a legitimate use of MRA funds.

### c. The Yukon

John describes specific instances where Hastert allegedly used his Yukon for personal business dealings. For example, John alleges that Hastert and Jarman used the Yukon to drive to St. Louis for a wrestling tournament held in March of 2009. John also claims that Post and Harbin would use the Yukon to drive Hastert to private business matters, including deals that Hastert was negotiating with John, and to meetings for Hastert's lobbying work.

Overall, in order to establish the falsity of the vouchers, John has alleged that Hastert submitted false claims on a quarterly basis from 2008 through 2012. John has explained the method by which the allegedly false vouchers were submitted, what was

contained in the vouchers, and how Hastert acted fraudulently to receive reimbursements from the government through an allowance by the House with representative examples, establishing why the claims were false. Based on the Disbursement Statements, we can assume that the vouchers were sent to someone working for the House. Therefore, the Court holds that John has pleaded sufficient detail as to the allegations regarding the false claims.

## II. Public Disclosure Bar

Even though the Court has determined that John's amended complaint satisfies Rule 9(b)'s pleading requirements, *qui tam* actions are subject to the public disclosure bar, 31 U.S.C. § 3730(e)(4). The 1986 version of Section 3730(e)(4)(A) deprives the court of jurisdiction over an action that is "based upon the public disclosure" of the allegations unless the relator is the original source of the information upon which his lawsuit is based. 31 U.S.C. § 3730(e)(4). With the 1986 version, courts found the "jurisdictional" nature of the public disclosure bar as "necessarily intertwined with the merits of the case," *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (en banc), *overruled on other grounds by Minn–Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012), and that although Section 3730(e)(4)(A) uses the term "jurisdiction," the United States Supreme Court has said that it actually raises an issue of substantive law. *See Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 950-51 (1997) (stating that Section 3730(e)(4)(A) not only speaks to the power of the court, but to the substantive rights of the parties as well).

The 2010 version of Section 3730(e)(4)(A) disposed of the "jurisdictional" language and instead added language permitting the United States government to waive the public disclosure bar at its discretion. The 2010 version states that "[t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . unless . . . the person bringing the actions is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (2010). Before 2010, the Seventh Circuit interpreted "based upon" to mean "substantially similar to the allegations already in the public domain." *See Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 910 (7th Cir. 2009). Thus, the 2010 amendment incorporated the Seventh Circuit standard. John's allegations need to be substantially similar to the public disclosure to establish the first step of the inquiry.

Because the 2010 amendment is not retroactive, the applicable version of Section 3730(e)(4) is the one that was "in force when the events underlying th[e] suit took place." *Leveski*, 719 F.3d at 828 (internal quotations omitted). Accordingly, the 1986 version applies to Hastert's allegedly fraudulent contact that occurred before March 23, 2010, and the 2010 version applies to fraudulent conduct that occurred thereafter. *See id.*

### A. Whether Lawsuit is Based Upon Publicly Disclosed Allegations

Attached to the instant motion to dismiss, Hastert provides Chicago Tribune articles (the "Tribune articles") from November 2012, which report generally that

Hastert's Office personnel used its resources to coordinate and perform work related to Hastert's private business dealings with John. The Court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). We can properly take judicial notice of the Tribune articles attached to Hastert's motion to dismiss to conclude that the information contained in John's complaint has previously been publicly disclosed and was in the public realm. *See U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015) (where the Eleventh Circuit agreed with the district court's decision to take judicial notice of five newspaper articles in a FCA case); *see also Lehman v. Vill. of Oak Park, Ill.*, 420 F. Supp. 2d 892, 895-96 (N.D. Ill. 2006) (taking judicial notice of fact or newspaper publication on motion to dismiss).

With respect to the second factor, John claims that the allegations of his amended complaint are not "'based upon' anything that was disclosed by the Tribune or anywhere else other than from Mr. John's own experiences and observations" and that his "allegations [are] well beyond anything published by the Tribune." Compared to the Tribune articles, the additional information John provides in his amended complaint does not qualify his lawsuit as "dissimilar" to the Tribune articles. It is obvious that the Tribune articles and John's amended complaint both allege that Hastert used the Office of the Former Speaker for private business deals. More specifically, the Tribune articles and John's amended complaint each reference the

Formula One racetrack, sporting events in the Middle East and the three meetings John had with Hastert at the Office to discuss private business ventures. Even though John's amended complaint discusses these meetings and business ventures in more detail, and clearly includes more allegations, "a *qui tam* action even partly based upon publicly disclosed allegations or transactions is nonetheless 'based upon' such allegations or transactions." *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F. 3d 688, 691 (7th Cir. 2014) (citing *Glaser*, 570 F. 3d at 920)). Thus, under both versions of the FCA statute, the Court finds that the allegations in John's amended complaint are substantially similar to the public disclosures about Hastert released prior to the filing of this lawsuit, satisfying the "based upon" factor. The first two elements supporting a jurisdictional bar are, therefore, satisfied. The question comes down to whether John is the original source of the information set forth in his amended complaint.

## B. Original Source

In his amended complaint, John alleges in Paragraph 32 that "[a]s Mr. John has direct and independent knowledge and is an original source of these illegal reimbursements, he brings this *qui tam* action." In his motion to dismiss, Hastert argues that John is not the "original source" of the information. Specifically, Hastert claims that John has not shown that he voluntarily provided or disclosed such information either prior to the public disclosure in the Tribune articles in November 2012 or before filing his complaint on July 12, 2013. Absent from his amended complaint, but brought to the Court's attention through an affidavit attached to his

- 24 -

response to the instant motion, John claims that in September 2011, more than a year prior to the Tribune articles being published, John voluntarily disclosed to FBI Special Agent Doug Soika ("Agent Soika") that Hastert was using the Office for Hastert's personal business in violation of federal law. The issue is whether we can legally incorporate these allegations as part of John's amended complaint.

Since Hastert's alleged actions occurred before and after the 2010 amendment to the FCA statute, we need to analyze both definitions of an original source, which are quite similar. The pre-2010 version states that John is the original source if he: (i) has direct knowledge of the information on which his allegations are based; (ii) has "independent" knowledge of the information on which his allegations are based; and (iii) "has voluntarily provided the information to the Government before filing" a complaint based on his information. 31 U.S.C. § 3730(e)(4)(B). According to the post-2010 version of Section 3730(e)(4)(B), to qualify as an original source "means an individual who either (i) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (ii) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B) (2010). Under both versions, voluntary disclosure to the government is a prerequisite.

### 1. Allegations Before 2010

Since the 2010 amendment is not retroactive, the allegations against Hastert before 2010 still fall under 12(b)(1) and the jurisdictional nature of the public disclosure bar. However, it is important to remember that the United States Supreme Court has said that the public disclosure bar actually raises an issue of substantive law. *See Hughes Aircraft Co.*, 520 U.S. at 950-51. When reviewing a dismissal for lack of subject matter jurisdiction, a district court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). The burden of demonstrating that subject matter jurisdiction exists is on the party asserting jurisdiction who must establish its propriety by competent evidence. *United Phosphorus*, 322 F.3d at 946. Under Rule 12(b)(1), there are two types of attacks on jurisdiction: facial and factual. For a facial attack, if the amended complaint itself does not sufficiently allege a basis for subject matter jurisdiction, the Court simply takes the allegations as true and does not look beyond the allegations in the amended complaint. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009). A factual attack disputes the facts alleged in a complaint that purport to establish subject-matter jurisdiction. With this type of attack, the Court may also "look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether *in fact* subject matter

jurisdiction exists." *Miller v. F.D.I.C.*, 738 F.3d 836, 840 (7th Cir. 2013) (emphasis added) (internal quotation marks and citation omitted).

When determining whether Hastert's attack on the amended complaint is facial or factual, the Court needs to look at the well-pleaded allegations themselves. In order to consider documents outside the four corners of the amended complaint, in his affidavit attached to his response to the motion to dismiss, John needed to have expounded on allegations about disclosing information to the government. *See Flying J., Inc. v. City of New Haven,* 549 F.3d 538, 542 n. 1 (7th Cir. 2008) ("[A]dditional facts can be presented as long as they are consistent with the complaint." ). After careful review, the only allegation regarding John as the original source that the Court found is that John alleges that "[a]s Mr. John has direct and independent knowledge and is an original source of these illegal reimbursements, he brings this *qui tam* action." Legal conclusions and conclusory allegations that merely recite the elements of a claim, like this allegation, are not entitled to the presumption of truth afforded to well-pleaded facts. *See McCauley*, 671 F.3d at 616. Consequently, the Court cannot even consider the affidavit since it is not consistent with the any well-pleaded allegations about John as the original source in the complaint. John's attempt to remedy this mistake by attaching it to his response is not enough to satisfy his burden of showing that he disclosed the information to the government.

### 2. Allegations After 2010

Hastert's alleged violations spanned from 2008 to 2012. John's post 2010 allegations are not subject to the same jurisdictional analysis and fall under a Rule 12(b)(6) analysis. Under Federal Rule of Civil Procedure 12(d), a district court may not normally consider "matters outside the pleadings" without converting a Rule 12(b)(6) to a summary judgment motion under Rule 56. Fed. R. Civ. P. 12(d). "It is well settled that in deciding a Rule 12(b)(6) motion, a court may consider 'documents attached to a motion to dismiss. . . *if they are referred to in the plaintiff's complaint and are central to this claim.*' ". *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (emphasis added)). The Seventh Circuit has stressed that this "is a narrow exception" and "not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment." *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998); *see also Tierney v. Vahle*, 304 F.3d 734, 739 (7th Cir. 2002) (explaining that "the scope of the exception . . . is uncertain; perhaps it is or should be limited to cases in which the suit is on a contract or the plaintiff, if he has not attached, has at least quoted from, the document later submitted by the defendant"). Under this exception, such documents "are considered part of the pleadings," and therefore may properly be considered without conversion, "if they are referred to in the plaintiff's complaint and are central to his claim."

*Wright*, 29 F.3d at 1248 (citing *Venture Associates Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

The general rule under 12(d) applies to documents attached to a motion to dismiss, not to a plaintiff's response to a motion to dismiss. Therefore, the Court will not construe the motion to dismiss as a motion for summary judgment. Also, the Court refuses to apply the narrow exception discussed in *Brownmark* since John does not include any well-pleaded allegations about him as the original source or any allegations whatsoever about his conversations with Agent Soika in his amended complaint. This was a fatal mistake. Additionally, John failed to even provide an explanation to the Court in his response to the motion to dismiss for this shortcoming. Assuming arguendo that the affidavit was incorporated, the Court still finds that John has not properly alleged enough information in his affidavit to show how Hastert was violating the Former Speaker Statute when John allegedly spoke to Agent Soika prior to the filing of the lawsuit.

The Court, thus, cannot determine, based on the amended complaint and permissible exhibits, that John is indeed the original source of the Tribune article and disclosed the information to the government. We are forced to find that he is not based on the pleadings provided.

## CONCLUSION

For the aforementioned reasons, the Court grants Hastert's motion to dismiss.


_____
Charles P. Kocoras
United States District Judge


Dated:  3/4/2015