UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. J. DAVID JOHN, | ) | |
| | ) | No. 13-cv-5014 |
| v. | ) | Hon. Judge Kocoras |
| | ) | |
| J. DENNIS HASTERT, | ) | Hon. Magistrate Judge Rowland |

SECOND AMENDED COMPLAINT
(*QUI TAM*)

Now Comes the United States of America ex rel., J. David John (hereinafter

"Mr. John"), by and through Michael K. Goldberg, Esq. and John Muldoon, Esq. and

brings this action under the Federal False Claims Act, 31 U.S.C. §§3729 – 3733,

against J. Dennis Hastert (hereinafter "Mr. Hastert") seeking relief against the

Defendant on behalf of the United States of America for false claims submitted to

the United States Congress:

## I.     THE RELATOR

1.     Relator, J. David John., is a U.S. citizen and Illinois businessman, residing

in Burr Ridge, Illinois.

2.     Mr. John has a Master's Degree from Columbia University and a MBA

from the University of Chicago.

3.     Beginning in 1992 Mr. John became closely associated with defendant J.

Dennis Hastert, based upon their shared background of being graduates of

Wheaton College and former college wrestlers.

4.     Mr. Hastert is a former member of the United States House of

Representatives and a former Speaker of the House.

EXHIBIT A

5.   Mr. Hastert retired from the House in 2008.

6.   Upon his retirement from the House, Mr. Hastert opened the Office of the Former Speaker in Yorkville, Illinois located at 759 John St., Ste. A Yorkville, IL 60560 ("Yorkville Office.")

7.   Under the rules of the House of Representatives the Former Speaker is allowed to have an office for up to five years. Mr. Hastert kept his office for exactly five years based on official filings with the House (first quarter 2008 through fourth quarter 2012)

8.   During the relevant time period of 2008 to 2012, J. David John, represented the television sports network, ESPN in seeking to organize a professional golf tournament in the Middle East ("Middle East ESPN deal.")

9.   He also represented Interstate, a U.K. company known for building brand identities, which was interested in developing a Formula One racetrack and a technology park in Riverside County, California (the "California deals".)

10.   Upon Mr. Hastert's retirement from the House, Mr. John approached him to assist on the Middle East ESPN deal and California deals as well as other business deals.

11.   Mr. John also worked with Mr. Hastert on the Wheaton College wrestling team, fund raising for the Hastert Center, other personal projects, and various social affairs.

12.   For example and not by way of limitation:

a.    In September of 2010, Mr. Hastert asked Mr. John to contact brokers on his behalf to get bids on purchasing an annuity which would create $70,000 in annual income for Mr. Hastert;

b.    Mr. John met with Mr. Hastert to discuss the Middle East ESPN deal, the California deals, his efforts on securing an annuity broker and the other personal business ventures in the Yorkville Office and

c.    Mr. John worked with Lisa Wagner, head fundraiser for the Hastert Center. He had three meetings with donors and raised $250,000 for the Hastert Center.

13.    Everything Mr. John worked on with Mr. Hastert was coordinated through the Office of the Former Speaker and Mr. Hastert's federally funded secretary Lisa Post.

14.    Although Mr. Hastert sometimes used stationery with the heading "Hastert & Associates;" the address was actually that of one of his clients, HR Green, and Mr. Hastert had no phone or email access at that address and had no staff at that location.

15.     All mail and email on Mr. John's business deals with Mr. Hastert were sent to the Yorkville Office and its email domain "@formerspeaker.org."

16.    Most telephone contact Mr. John had with Mr. Hastert was through the mobile phone issued from the Yorkville Office.

17.     David John and his partners paid airfare, transfers, hotels, meals and other expenses for Hastert when he traveled with them to work on specific deals.

18.     Hastert and David John attended meetings together in Singapore, Montreal, Torrance, CA, Palm Springs, CA, LaQuinta, CA, Naples, FL, Washington D.C. and Jeddah, Saudi Arabia.

19.     Additionally they attended several meetings in the Chicago area including a meeting with Chicago Mayor Richard Daley.

20.     All the other people attending these meetings were also coordinated through the Office of Former Speaker Hastert.

21.     The staff of the Office of the Former Speaker also assisted in arranging a meeting with Mary Bono Mack in California.

22.     When Mr. Hastert attended these meetings he used his business cards from the Office of the Former Speaker to provide contact information and used the official letterhead to correspond with potential business partners and investors.

23.     This in direct violation of the rules of the House of Representatives.

24.     Mr. Hastert also used his official letterhead to write a letter on behalf of Mr. John which memorialized their business relationship.  (Exhibit 1)

25.     In addition to establishing the Yorkville Office following his retirement, Mr. Hastert joined the lobbying firm of Dickstein Shapiro in June of 2008 as a senior adviser.

26.     Because of his intimate business and social relationship with Mr. Hastert, Mr. John was in a unique position to observe the workings of the Yorkville Office.

27.     Mr. John observed that in addition to his personal business deals with Mr. Hastert, most of the work done by Mr. Hastert and his staff was on founding and

developing the "J. Dennis Hastert Center for Economics, Government and Public Policy" (the "Hastert Center"); Mr. Hastert's lobbying business and other personal business ventures.

28.   Mr. John was informed by the staff of the Yorkville office that any business related to the conclusion of matters pertaining to the Former Speaker was completed in 2008.

29.   Mr. John is also informed that Mr. Hastert was reimbursed for the Yorkville Office's rent, staff salaries and other expenses through the U.S. House of Representatives Members' Representational Allowance.

30.   Because most of the Yorkville Office's expenses were related to Mr. Hastert's non-governmental, personal business ventures, the reimbursements were made in violation of federal law.

31.   As Mr. John has direct and independent knowledge and is an original source of these illegal reimbursements, he brings this *qui tam* action pursuant to the Federal False Claims Act, 31 U.S.C. §§3729 – 3733.

## II. DEFENDANT AND HIS STAFF

32.   Defendant, J. Dennis Hastert, resides in Yorkville, Illinois, and from January 1987 through November 2007, served as the Representative of Illinois's 14th District in the United States House of Representatives.

33.   In 1999, he became the 59th Speaker of the United States House of Representatives and he served in that position through 2007.

34.   As stated above, in 2008, Mr. Hastert opened the Yorkville Office.

35.    Rent and all other expenses related to the Yorkville Office were reimbursed by the federal government pursuant to 2 U.S.C. §31b-2.

36.    The Yorkville Office maintained three full-time administrative personnel that were paid between $113,000 and $139,000, pursuant to 2 U.S.C. §31 b-5.

37.    As stated above, during the period June 2008 through November 2012 Mr. Hastert was engaged in a substantial lobbying role with numerous large business clients including the Republic of Turkey since April 2009.

38.    Mr. Hastert was also directly involved in a number of Illinois companies, *e.g.* The Servicemaster Company, HR Green, Polybrite[1] and Centerpoint Properties.

39.    Mr. Hastert was also a member of the Board of Directors for the Chicago Mercantile Exchange and acted as a lobbyist and business consultant for the CME.

40.    Lisa Post was a federal employee that worked for the Office of the Former Speaker of the House in Yorkville, Illinois.

41.    Ms. Post's official duties were answering the phone, preparing the correspondence of the Former Speaker, as well as booking his travel arrangements, and other administrative duties under the direction of Mr. Hastert.

---

[1] Mr. Hastert also holds equity in Polybrite.

42.    Bryan Harbin was a federal employee that worked for the Office of the Former Speaker of the House in Yorkville, Illinois.

43.    Mr. Harbin's official title was "administrative assistant".

44.    Thomas Jarman was a federal employee that worked for the Office of the Former Speaker of the House in Yorkville, Illinois.

45.    Mr. Jarman's official title was "secretary".

## III. ORIGINAL SOURCE

46.    Mr. John is the original source of the allegations of this Second Amended Complaint pursuant to 31 U.S.C. § 3730(e)(4)(B) because he has knowledge that is independent of and materially adds to any of the publicly disclosed allegations in this case, and has voluntarily provided the information to the Government before filing this action.

47.    On August 31, 2011, Mr. John filed a complaint against Wheaton College in the Circuit Court for 18th Judicial Circuit DuPage Illinois.

48.    In that complaint Mr. John alleges that Wheaton College interfered with his business relationship with Mr. Hastert.

49.    Prior to filing this lawsuit, on August 30, 2011 at 4:17pm, Mr. John had a telephone conversation with FBI Special Agent Doug Soika.

50.    In that telephone conversation, Mr. John told Special Agent Soika that:

    a.    He was filing a complaint against Wheaton College wherein he was alleging that Wheaton College interfered with his business relationship with Mr. Hastert;

7

b.     He had been involved in various business ventures with Mr. Hastert from 2009 through January 2011;

c.     He had met with Mr. Hastert regarding these ventures in the Offices of the Former Speaker and

d.     He had knowledge that Mr. Hastert was using the federally funded offices, staff, office supplies and vehicles for his personal business ventures.

51.    Mr. John also spoke to S. A. Soika on August 30, 2011 at 12:16 pm, September 19, 2011at 4:55pm and October 21, 2011 at 9:39am.

52.    During at least one of those conversations and maybe more, Mr. John spoke to S.A. Soika regarding Mr. Hastert's use of the federally funded office, staff and equipment for personal business ventures.

53.    On February 29, 2012, Mr. John filed an Amended Complaint which detailed many of the private business ventures for which Mr. Hastert was utilizing his federally funded offices, staff and equipment.

54.    On February 29, 2012, Mr. John filed an amended complaint which detailed many of the private business ventures for which Mr. Hastert was utilizing his federally funded offices, staff and equipment.

55.    On October 3, 2012, Mr. John filed a second amended complaint again detailing many of the private business ventures for which Mr. Hastert was utilizing his federally funded offices, staff and equipment.

56.    On November 14, 2012 the Chicago Tribune picked up on Mr. John's second amended complaint and reported Mr. John's allegations regarding Mr. Hastert's use

of the federally funded office, staff and equipment for personal business ventures. (See copy of actual article attached as Exhibit 2)

57.     There are 64 paragraphs in the Tribune story; 41 of which either reference Mr. John by name or his complaint filed in DuPage County.

58.     Accompanying the Tribune article is a picture of Mr. John and Mr. Hastert in Montreal (See Exhibit 3) and a copy of an email sent to Mr. John from Lisa Post, Mr. Hastert's secretary. (See Exhibit 4)

59.     The Tribune cites the second amended complaint filed in DuPage County as the source of the article's content regarding the allegations of Mr. Hastert's use of the federally funded office, staff and equipment for personal business ventures.

60.     For example, the Tribune alleges that Mr. Hastert had meetings with Mr. John at the Office of the Former Speaker concerning the Formula One Track in California.

61.     This information comes directly from Mr. John and the Tribune expressly attributes the information to Mr. John; *e.g.*:

    a.     "A suburban Chicago businessman who was involved in the business ventures with Hastert said he met with Hastert at least three times in the government office to discuss the projects."

    b.     "Court records, interviews, and dozens of emails link the Office of the Former Speaker to J. David John, a Burr Ridge businessman who made six of the emails public in a lawsuit in DuPage County against Wheaton College, a small, evangelical Protestant institution."

9

c.      "Emails between John and Post that link the Office of the Former Speaker to Hastert's business dealings first surfaced during a court battle John is waging against Wheaton College."

d.      "John, 48, and Hastert are both graduates of Wheaton.  John said in court papers that he met Hastert about 16 years ago, and both men wrestled at Wheaton and remain fans of the sport."

e.      "John graduated from Wheaton in 1985 and later earned a master's degree from Columbia University and an MBA from the University of Chicago.  He is the managing U.S. partner for Interstate, a London-based firm that specializes in product and brand identity and has worked with Formula One auto racing."

f.      "By 2008, Hastert teamed with John on several ventures, including proposals for a Formula One quality racetrack in Southern California and sporting events in the Middle East, John said in court records."

g.      "Hastert was to receive 7 to 10 percent of the managing partners' proceeds from each project, John said in court papers."

h.      "Lisa Post, a secretary in the Office of the Former Speaker who handles Hastert's schedule, was in contact with John on the projects.  Post used the email address [lisapost@formerspeaker.org](mailto:lisapost@formerspeaker.org) to communicate with John regarding his and Hastert's business travels and meetings from 2008 through 2010."

i.      "In an email about the racetrack, Post asked John to call her at the Office of the Former Speaker and gave him an office cellular telephone number. 'I talked with the Speaker about this project/trip and I wanted to pass on a few things to you' she wrote in the Oct. 16, 2008 email."

j.      "Weeks later, on Dec. 8, Post sent John and email saying she had conducted research related to the racetrack project and shared with Hastert 'what my research turned up."

k.      "Hastert told the Tribune he was unaware of Post conducting research and saw no problem with Post's use of office email to communicate with John."

l.      "Post, speaking to a reporter during a September visit to the office, said her job in the Office of the Former Speaker was, 'The same as it's always been, which would be to manage the speaker's schedule.' She would not elaborate and declined to answer follow up questions relating to the emails between her and John."

m.      "While Hastert insisted he did no private business through the office, a letter written by the ex-speaker indicates that the California racetrack project was indeed a personal business venture for him."

n.      "Hastert, using a letterhead from Hastert & Associates, on Nov. 10, 2008, wrote to a local government official in California and praised the project. In the letter, which John filed in court, Hastert wrote that he looked forward to meeting with the official."

11

o.     "'David John has invited me to serve as a director for a project in your district of Riverside County.' Hastert wrote… 'In my conversations with David he told me you have already been very supportive of this idea.  I believe that (Rep.) Mary Bono Mack will also be very eager to see this project come to fruition.'"

p.     "In December 2008, Hastert and John traveled to Southern California for a series of meetings with potential racetrack investors and Riverside County authorities, according to interviews and emails. Tom Jarman, then a staffer in the Office of the Former Speaker, also was on the trip."

q.     "John said he invited Jarman to attend meetings and serve as a consultant."

r.     "John and his partners planned a racetrack and research center on 610 acres of government land in Mack's district."

s.     "A year and a half after the California trip, Hastert and John traveled to Montreal to watch a Formula One race.  The trip fit in with John's plans to someday stage a street race in Chicago."

t.     "Post emailed John about travel arrangements. 'Thanks for the flight info,' Post wrote in a June 2, 2010, email. 'I don't see the Speaker's (frequent flier number) on here and I apologize if I didn't get it to you, I will call United and get it added to the record.'"

u.    "Hastert said that John paid for that trip as well.  He said he flew to Montreal to check out a Formula One race and to gather information, with hopes of bringing the international event to Chicago's lakefront."

v.    "In other emails, Post discussed an upcoming February 2009 meeting involving John, Hastert and the United Arab Emirates ambassador in Washington, John had plans for staging sporting events such as golf and basketball in Middle East countries."

w.    "Hastert and John, according to emails, met with the ambassador and his staff Feb. 9.  The next day, John wrote to the ambassador's chief of staff and thanked them for 'taking the time to meet with Speaker Hastert and me'."

x.    "John said he met at least three times with Hastert in 2008 and 2009 inside the Office of the Former Speaker."

y.    "Emails from Post show two of the meetings likely occurred Oct. 29, 2008 and Nov. 7, 2008.

62.    This information comes directly from Mr. John and the Tribune expressly attributes the information to Mr. John.

63.    However, most of the complaint's allegations were not mentioned by the Tribune and were never made public until the unsealing of the original complaint in this case, *i.e.*:

a.    claims that two employees at Mr. Hastert's Office of the Former Speaker ran their own private businesses from the Office premises;

13

b.     a third employee performed non-official work at Wheaton College;

c.     a motor vehicle was used for non-official purposes;

d.     use of a blackberry phone for non-official purposes;

e.     legal services for non-official purposes;

f.     use of official letterhead and postage for personal and private business purposes;

g.     Hastert's and staff work on Hastert Center was not related to concluding the affairs of Mr. Hastert as Former Speaker;

h.     Hastert submitted vouchers to the House of Representatives for and was reimbursed from the MRA, resources, personnel and equipment which were NOT ordinary and necessary of the Office of the Former Speaker of the House for personal and private business matters and

i.     Mr. John has identified paid consultants as an improper use of the MRA.

## IV.     THE STATUTORY PROVISIONS

64.     2 USC §31b-1(a) provides that: Each former Speaker of the House of Representatives (hereafter referred to in sections 31b-1 to 31b-7 of this title as the "Speaker") is entitled to retain, for as long as he determines there is need therefor, commencing at the expiration of his term of office as a Representative in Congress the complete and exclusive use of one office selected by him in order to facilitate the administration, settlement, and conclusion of matters pertaining to or arising out of his incumbency in office as a Representative in Congress and as Speaker of the

House of Representatives. Such office shall be located in the United States and shall be furnished and maintained by the Government in a condition appropriate for his use.

65.     Under 2 USC §31b-2 the Speaker is entitled to have the applicable accounts of the House of Representatives be available for payment of, for as long as he determines there is need therefor, commencing at the expiration of his term of office as a Representative in Congress, an allowance equal to the Members' Representational Allowance [("MRA")] (to be paid in the same manner as such Allowance) for office and other expenses incurred in connection with the administration, settlement, and conclusion of matters pertaining to or arising out of his incumbency in office as a Representative in Congress and as Speaker of the House of Representatives.

66.     2 U.S.C. §31b-5 provides that staff assistance to the Speaker in connection with the administration, settlement, and conclusion of matters pertaining to or arising out of his incumbency in office as a Representative in Congress and as Speaker of the House of Representatives, the contingent fund of the House is hereby made available, for as long as he determines there is need therefor, commencing at the expiration of the term of office of the Speaker as a Representative in Congress for payment of the salaries of an Administrative Assistant, who shall be paid at a basic per annum rate of not to exceed the then current rate for step 11 of level 13 of the House Employees Schedule, as determined by the Speaker, a Secretary, who shall be paid at a basic per annum

15

rate of not to exceed the then current rate for step 8 of level 12 of such Schedule, as determined by the Speaker, and an additional Secretary, who shall be paid at a gross per annum rate of not to exceed the then current rate for step 7 of level 11 of such Schedule as determined by the Speaker, designated and appointed by the Speaker to serve as members of his office staff in such period.

67.    The entitlements of a former Speaker of the House of Representatives under sections 31b-1 to 31b-7 of this title shall be available in the case of an individual who becomes a former Speaker after October 1, 1993, for 5 years, commencing at the expiration of the term of office of the individual as a Representative in Congress.

## V. THE REIMBURSEMENT PROCEDURE

68.    During each session of Congress, each Member has a Members' Representational Allowance ("MRA") available to support the conduct of official and representational duties to the district from which he or she is elected. (See Exhibit 5 downloaded from http://cha.house.gov/ handbooks/members-congressional-handbook)

69.    "Ordinary and necessary expenses incurred by the Member or the Member's employees … are reimbursable accordance with the regulations contained in [the] Members' Congressional Handbook." (See Exhibit 5)

70.    Pursuant to 2 USC §31b-2 the ordinary and necessary expenses incurred by for the Office of the Former Speaker are reimbursed through the same MRA process as other members of the House of Representatives.

71.    "'Ordinary and necessary' means reasonable expenditures in support of official and representational duties to the district from which he or she is elected…" (See Exhibit 5)

72.    Incidental personal use of equipment and supplies owned or leased by, or the cost of which is reimbursed by the House of Representatives is permitted only when such use is negligible in nature, frequency, time consumed, and expense. (See Exhibit 5)

73.    Disbursements from the MRA are made on a reimbursement or direct payment basis and require specific documentation and Member certification as to accuracy and compliance with applicable federal laws, House Rules, and Committee regulations. Exhibit 5)

74.    Disbursements from the MRA are paid on a reimbursement basis or by direct payment (to vendors) and require:

    a.    The Member's signature, certifying that the expense was incurred in support of the Member's official and representational duties to the district from which he or she is elected.

    b.    Supporting documentation (receipt, lease, bill etc.). Exhibit 5)

75.    These vouchers are submitted for reimbursements from the MRA. (See Statement of Disbursements (http://disbursements.house.gov/sod-glance.shtml) attached as Exhibit 6)

76.    The disbursements from the MRA are compiled and published as the Quarterly Statement of Disbursements ("SOD"), which is a public document.

77.    The SOD is a quarterly public report issued by the Chief Administrative Officer of the House (CAO).

78.    This document is published within 60 days of the last day of the quarter. The issuance of the SOD satisfies the law requirement found in 2 USC 104a. (See Exhibit 6)

79.    Attached to this complaint as Exhibit 7 are the relevant pages of the SOD for the years 2008 through 2012, which show the disbursements for the Office of the Former Speaker.

80.    In order to receive these disbursements, Defendant Hastert was required to sign and certify that each expense was incurred in support of his official duties.

81.    Highlighted in Exhibit 7 are SOD records of reimbursement of expenses which were not expended in support of Defendant Hastert's official duties "to facilitate the administration, settlement, and conclusion of matters pertaining to or arising out of his incumbency in office as a Representative in Congress and as Speaker of the House of Representatives."

## VI. THE VIOLATIONS

82.    Mr. Hastert submitted vouchers to the House of Representatives for and was reimbursed from the MRA, resources, personnel and equipment which were NOT ordinary and necessary of the Office of the Former Speaker of the House for private business matters.

## A.   RENT

83.    Mr. Hastert submitted vouchers and was reimbursed from the MRA for the full rent of the Yorkville Office, while using it mainly for his private businesses.

84.    Mr. Hastert held private meetings at the Yorkville Office with Mr. John relating to the proposed deals that he and Mr. John were attempting to set up, including the construction of a Formula One racetrack and technology park in Riverside County, California and an ESPN covered PGA golf tournament in Abu Dhabi. Pursuant to the agreement between Mr. Hastert and Mr. John, Mr. Hastert was to receive seven to ten percent of the founders' equity and corresponding profits from cash flow and sale if any of the deals were successfully completed.

85.    For example and not by way of limitation, there were meetings held at the Yorkville Office with Mr. John concerning the projects, including but not limited to the proposed racetrack and technology park venture Mr. John represented as identified in Paragraph 40 on October 2, 2008, November 7, 2008 and February 2, 2009.

86.    Mr. Hastert and Mr. John met several times in the Office to discuss Mr. Hastert's personal finances in September 2010.

87.    Mr. John also called Mr. Hastert both on his cell phone and at the Yorkville Office to discuss the private business deals and Mr. Hastert's personal finances.

88.    These activities were not related to concluding the affairs of Mr. Hastert as a Representative and as Speaker of the House of Representatives.

89.    From March 2008 through January 2013 Mr. Hastert submitted quarterly vouchers for reimbursement of the full rent of the Yorkville Office and was reimbursed from the MRA for the full rent of the Yorkville Office.

### B.    EMPLOYEES

90.    Mr. Hastert regularly used his federal employees, Lisa Post and Bryan Harbin, to make arrangements for, do research for, and coordinate with third parties concerning Mr. Hastert's private business dealings.

91.    As described above, Lisa Post did extensive work for Mr. John, including using the computer, email, fax and telephones of the Office of the Former Speaker to prepare Mr. Hastert for these private business meetings, including research and coordinate meetings with third persons having a current or potential interest in his private business ventures.

92.    By way of example and not by way of limitations attached as Group Exhibit 8 is a sampling of emails from Ms. Post using her email address lisapost@formerspeaker.org related to Mr. Hastert's private business ventures with Mr. John:

   a.    Email dated October 28, 2008 giving Mr. John directions to the Yorkville Office for a meeting regarding private business ventures with Mr. John;

   b.    Email dated October 15, 2008 scheduling a private business meeting in California with Mr. Hastert and Mr. John to discuss an alternative energy research park;

    c.  Email dated October 27, 2008 scheduling a meeting between Mr. John, Mr. Hastert and Mr. Jarman;

    d.  Email dated October 30, 2008 regarding drafting a letter to Roy Wilson the County Supervisor in California regarding the energy research park;

    e.  Email dated November 25, 2008 regarding the travel arrangements to the California meeting regarding the energy research park;

    f.  Email dated December 9, 2008 coordinating Mr. John's meeting with Mr. Hastert and Mr. Jarman in California and

    g.  Email dated February 6, 2009 regarding a meeting with the Ambassador for the United Arab Emirates regarding the ESPN golf venture;

93.    Ms. Post apparently knew using the Yorkville office for Mr. Hastert's private business was illegal as is evidenced by:

    a.  Email dated November 10, 2008 sent to Mr. John stating that she should not fax letter regarding the California project from the Yorkville office and

    b.  Email dated December 5, 2008 sent to Mr. John stating that her involvement in the California trip should be limited as it relates to a personal venture of Mr. Hastert's.

(See emails attached as Exhibit 9)

94.    Ms. Post, Mr. Jarman and Mr. Harbin, used the resources of the Yorkville Office, including the office space, their desks, their Blackberry phones, as well as

the phone, fax, computer, and email of the Office of the Former Speaker to perform research and prepare Mr. Hastert for his private business meetings.

95.     Use of the Yorkville Office and the time for these private business meetings were not related to concluding the affairs of Mr. Hastert as Former Speaker.

96.     Ms. Post and Mr. Harbin were also operating their own private businesses daily during the hours they were being paid to work at the Yorkville Office.

97.     Mr. Harbin was involved with Progressive Energy, with offices located in Suite 200 of the same building as the Office of Former Speaker.

98.     Mr. Harbin's wife also worked for Progressive Energy in the Yorkville Office.

99.     Mr. Harbin's activities were not related to concluding the affairs of Mr. Hastert as Former Speaker.

100.    Mr. Jarman was primarily involved with the, "J. Dennis Hastert. Center for Economics, Government and Public Policy at Wheaton College" ("Hastert Center") and Mr. Hastert's official archives.

101.    Mr. Jarman's work on behalf of the Hastert Center was not related to concluding the affairs of Mr. Hastert as Former Speaker.

102.    Mr. Hastert had knowledge that the activities of Ms. Post, Mr. Jarman and Mr. Harbin were not related to concluding the affairs of Mr. Hastert as Former Speaker.

103.    From March 2008 through January 2013 Mr. Hastert submitted quarterly vouchers for reimbursement of the full salaries of Ms. Post, Mr. Harbin and Mr. Jarman and was reimbursed from the MRA for the full salary of these employees.

## C. MOTOR VEHICLE

104.   Mr. Hastert was reimbursed from the MRA for the full cost of the GMC Yukon while using it mainly for his personal use and his private businesses.

105.   Yet Mr. Hastert submitted vouchers to the House of Representatives which claimed that the entire expense of the vehicle as an ordinary and necessary expense of the Office of the Former Speaker.

106.   For example and not by way of limitation, Mr. Hastert and Mr. Jarman used the GMC Yukon to drive to St. Louis to attend the NCAA Division I Wrestling championships held March 19-21, 2009.

107.   Most often Ms. Post or Mr. Harbin drove Mr. Hastert during official office hours to facilitate private business matters, including deals he was setting up and negotiating with Mr. John, in addition to his private lobbying work for Dickstein Shapiro and involvement and meetings with the Chicago Mercantile Exchange, The Servicemaster Company, HR Green, Polybrite and Centerpoint.

108.   These activities were not related to the conclusion of the affairs of Mr. Hastert as a Representative and as Speaker of the House.

109.   From March 2008 through January 2013 Mr. Hastert submitted quarterly vouchers for reimbursement of the full expenses of the GMC Yukon, including but not limited to lease and fuel payments and was reimbursed from the MRA for the full expenses of the GMC Yukon.

## D.    OFFICE EQUIPMENT AND SUPPLIES

110.   Mr. Hastert obtained phones, including but not limited to a Blackberry phone, computers, fax machines, cable television services email service and other office equipment and supplies (collectively referred to as "office equipment and supplies.")

111.   Mr. Hastert routinely used the office equipment and supplies for purposes that were not related to concluding the affairs of Mr. Hastert as Former Speaker.

112.   For example and not by way of limitation, Mr. Hastert used the same office Blackberry phone, regardless of whether the calls were related to Mr. John's business ventures, Mr. Hastert's lobbying work for Dickstein Shapiro, or the Chicago Mercantile Exchange, The Servicemaster Company, HR Green, Polybrite or Centerpoint Properties.

113.   These activities were not related to the conclusion of the affairs of Mr. Hastert as a Representative and as Speaker of the House.

114.   From March 2008 through January 2013 Mr. Hastert submitted vouchers for reimbursement of the full expenses of the office equipment and supplies and was reimbursed from the MRA for the full expenses of the office equipment and supplies.

## E.    BURNHAM STRATEGIES GROUP LLC

115.   Burnham Strategies Group LLC ("Burnham") was a public relations firm located in Geneva, IL.

116.   Burnham was founded by Mr. Hastert's former communication director and his former chief of staff.

117.   Burnham performed public relations services on behalf of Mr. Hastert.

118.   These public relations services were not related to the conclusion of the affairs of Mr. Hastert as a Representative and as Speaker of the House.

119.   Yet for every fiscal quarter from the 1st quarter of 2008 through the 1st quarter of 2011 inclusive, Mr. Hastert submitted vouchers for reimbursement of public relations expenses incurred for the services of Burnham and was reimbursed from the MRA for the public relations expenses incurred for the services of Burnham.

## F.   MCKENNA, LONG & ALDRIDGE

120.   McKenna, Long & Aldridge ("McKenna") is a law firm located in Washington, DC.

121.   McKenna performed legal services on behalf of Mr. Hastert.

122.   These legal services were not related to the conclusion of the affairs of Mr. Hastert as a Representative and as Speaker of the House.

123.   Yet for the 4th quarter of 2012, Mr. Hastert submitted a voucher for reimbursement of legal expenses incurred for the services of McKenna and was reimbursed from the MRA for the legal expenses incurred for the services of McKenna.

### G.     OTHER ACTIVITIES OF MR. HASTERT DURING 2008-2012

124.   During the years Mr. Hastert maintained his Office of the Former Speaker, he was employed as a full-time employee of Dickstein Shapiro.

125.   He was also heavily involved in personal business ventures with relator David John and other business partners.

126.   Furthermore, Mr. Hastert was also significantly involved with the establishment, development and operations of the Hastert Center.

127.   In fact, almost all of employee Mr. Jarman's responsibilities were devoted to the establishment and development of the Hastert Center.

128.   However, as established by the U.S. House of Representative's Report of the Committee on Standards of Official Conduct In The Matter Of Representative Charles B. Rangel ("Rangel Report")activities regarding the establishment and development of such a Center is not a legitimate use of MRA funds. (See relevant portions of the Rangel Report attached as Exhibit 10.)

129.   The reality is that Mr. Hastert had very little time to devote to concluding the affairs of Mr. Hastert as Former Speaker and that very few of the expenses for which he was reimbursed were related to the affairs of the Former Speaker.

### COUNT I
### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### [VIOLATIONS OF 31 U.S.C. § 3729]

130.   Mr. Hastert submitted vouchers for every fiscal quarter for the years 2008 through 2012, inclusive for reimbursement of the Yorkville Office rent, the office

equipment and supplies, the salaries of the three administrative employees, the lease and other expenses of the GMC Yukon and other expenses.

131.   These vouchers contained supporting documentation (*e.g.* receipt, lease, bill etc.) and Mr. Hastert's signature certifying that each expense was ordinary and necessary to his official duties as a former Speaker.

132.   Mr. Hastert certified the vouchers with knowledge that the use of the Yorkville Office, the office equipment and supplies, the salaries of the three administrative employees, the lease and other expenses of the GMC Yukon and other expenses were incurred in activities which were not ordinary and necessary to his official duties as a former Speaker.

133.   Each of these vouchers were presented to the House of Representatives, a part of the United States government, for payment from the MRA.

134.   Each of these vouchers constituted a claim for payment to the United States government.

135.   Approximately 454 of these vouchers for reimbursement was false.

136.   As stated above, attached to this complaint as Exhibit 7 are the portions of the quarterly SODs for 2008- 2012 which reflect the reimbursements made to Mr. Hastert based upon the false signed and certified vouchers he submitted for reimbursement of expenses from the MRA.

137.   In Exhibit 7 the reimbursements based upon false signed and certified vouchers submitted by Mr. Hastert are marked with a line as "___."

138.   Attached to this complaint as Exhibit 11 is a spreadsheet citing the reimbursements based upon the false signed and certified vouchers submitted by Mr. Hastert.

139.   Exhibit 11 reflects total reimbursement of $ 1,820,868.48 based upon 454 false signed and certified vouchers submitted by Mr. Hastert.

140.   Mr. Hastert violated the Federal False Claims Act Federal False Claims Act, 31 U.S.C., §3729 when he submitted false signed and certified vouchers for reimbursement of expenses from the MRA as reflected in the SODs attached hereto.

141.   Mr. Hastert also violated the Federal False Claims Act by accepting payment from the federal government based upon these false signed and certified vouchers for reimbursement of expenses from the MRA as reflected in the SODs attached hereto.

142.   Pursuant to the Federal False Claims Act, 31 U.S.C. §3729, each false voucher presented by Mr. Hastert to the federal government for reimbursement of expenses from the MRA as reflected in the SODs attached hereto is punishable by a $5,000 to $11,000 fine as well as three times the amount of damages sustained by the government.

143.   Similarly, the receipt of the funds by Mr. Hastert from the U.S. Government that were paid out based upon these false these false signed and certified vouchers for reimbursement of expenses from the MRA as reflected in the SODs attached hereto claims is a violation of the Federal False Claims Act.

## PRAYER FOR RELIEF

Wherefore, the United States of America, ex rel. J. David John, prays that this Honorable Court award the following relief:

A.      Enter a judgment against J. Dennis Hastert and in favor of the United States of America for all amounts submitted pursuant to 2 U.S.C. §§ 31b-1 through 31b-5 for the office, operational expenses, and salaries paid for the Office of J. Dennis Hastert in Yorkville, Illinois during 2008, 2009 2010, 2011, and 2012 and triple the amount of the judgment pursuant to 31 U.S.C. §3729;

B.      Enter a judgment against J. Dennis Hastert and in favor of the United States of America for $5,000 to $11,000 for each quarterly voucher submitted for expenses and salaries relating to the Office of J. Dennis Hastert in Yorkville, Illinois pursuant to 2 U.S.C. §§ 31b-1 through 31b-5 in violation of the Federal False Claim Act, 31 U.S.C. §3729;

C.      Enter a judgment in favor of the Relator, J. David John, for a percentage of the total amount of the judgment against J. Dennis Hastert as provided by the Federal False Claims Act, 31 U.S.C. § 3730; and

D.      Any and all additional relief provided for in law or equity which this Court deems fair and just.

## COUNT II
## CAUSING VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### [VIOLATIONS OF 31 U.S.C. § 3729]

144.   As Paragraphs 1-127 of Count II, Relator realleges and incorporates herein Paragraphs 1-127 above.

145.   All of the aforesaid vouchers submitted on a quarterly basis were signed and verified by Mr. Hastert.

146.   In signing and certifying each voucher each quarter of the claims submitted, while knowing that they were false Mr. Hastert violated the Federal False Claims Act, 31 U.S.C. § 3729.

147.   Pursuant to the Federal False Claims Act, 31 U.S.C., §3729, each false voucher presented to the federal government for payment is punishable by a $5,000 to $11,000 fine against the person or persons that caused the false statement as well as three times the amount of damages sustained by the government.

## PRAYER FOR RELIEF

Wherefore, the United States of America, ex rel. J. David John, prays that this Honorable Court award the following relief:

A.   Enter a judgment against J. Dennis Hastert and in favor of the United States of America for all amounts submitted pursuant to 2 U.S.C. §§ 31b-1 through 31b-5 for the office, operational expenses, and salaries paid for the Office of J. Dennis Hastert in Yorkville, Illinois during 2008, 2009 2010, 2011, and 2012 and triple the amount of the judgment pursuant to 31 U.S.C. §3729;

B.   Enter a judgment against J. Dennis Hastert and in favor of the United States of America for $5,000 to $11,000 for each quarterly voucher submitted for expenses and salaries relating to the Office of J. Dennis Hastert in Yorkville, Illinois pursuant to 2 U.S.C. §§ 31b-1 through 31b-5 in violation of the Federal False Claim Act, 31 U.S.C. §3729;

D.      Enter a judgment in favor of the Relator, J. David John, for a percentage of the total amount of the judgment against J. Dennis Hastert as provided by the Federal False Claims Act, 31 U.S.C. § 3730; and

E.      Any and all additional relief provided for in law or equity which this Court deems fair and just.

Respectfully Submitted;

/s/ John J. Muldoon, III
One of the Relators' Attorneys

John J. Muldoon, III
Muldoon & Muldoon LLC
30 N. LaSalle St., Suite 2950
Chicago, IL 60602
(312) 739-3550
IL Atty. No. 6185878
jjm@muldoonlaw.com

Michael K. Goldberg, 6210821
(mgoldberg@goldberglawoffice.com)
Goldberg Law Group, LLC
120 S. Riverside Plaza, Suite 1675
Chicago, Illinois 60606
(312) 930-5600
(312) 930-0944 (Fax)

# VERIFICATION

STATE OF ILLINOIS              )
                              )
COUNTY OF COOK                 )

On this day, J. David John, appeared before me, the undersigned notary public. After I administered the oath to him upon his oath, he said that he read the foregoing Second Amended Complaint and that the facts stated in it are within his personal knowledge and are true and correct.

_____
J. David John

SWORN TO and SUBSCRIBED before me by J. David John:

_____, 2015.

OFFICIAL SEAL
JOHN J MULDOON III
Notary Public - State of Illinois
My Commission Expires Jul 31, 2017