**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** <br> *ex rel.* **J. DAVID JOHN,** <br><br> **Plaintiff and Relator,** <br><br> v. <br><br> **J. DENNIS HASTERT,** <br><br> **Defendant.** | ) <br> ) <br> ) <br> ) No. 13-cv-5014 <br> ) <br> ) Hon. Judge Kocoras <br> ) Hon. Magistrate Judge Rowland <br> ) <br> ) <br> ) <br> ) <br> ) |

**J. DENNIS HASTERT'S MEMORANDUM OF LAW IN SUPPORT OF**
**OF HIS MOTION TO DISMISS RELATOR'S ACTION FOR LACK OF JURISDICTION**

This Court would have jurisdiction over the FCA claims of Relator John ("John") only if he shows that he qualifies as an "original source" of publicly disclosed allegations that exposed the violations of federal law he seeks to pursue. Court-ordered jurisdictional discovery unequivocally confirmed that John cannot establish the jurisdictional prerequisites, and this case should therefore be dismissed with prejudice.

John bases his claim that he is an "original source" entirely on vague assertions regarding telephone calls he purportedly had with an FBI Special Agent in 2011. John admits he does not remember the specifics of those calls, he has no notes or documents supporting his claimed recollection, and his story has differed in every account he has presented. Nothing corroborates John's vague and stale memory of telephone calls years ago.

The only records memorializing the calls John had with the FBI—contemporaneous official records prepared by an FBI Special Agent trained in preparing reports and investigating violations of federal law—show the calls had nothing to do with J. Dennis Hastert ("Hastert") or the Office of the Former Speaker (the "Office"). The FBI records carefully record John's

342142.2

complaints about his custody dispute in Arkansas with the mother of his child, and John's allegations that his privacy and civil rights were being violated—but nothing about Hastert. And in two sworn statements, Special Agent Soika states that John did not complain about anything related to Hastert or mention the Office, and that he would have recorded any such mention in his detailed report (and followed up on any alleged violations of federal law by Hastert).

Finally, even though John maintains that he made a generalized allegation to FBI Special Agent Soika at some point that Hastert was using the Office in connection with "personal business ventures," John also testified that: (1) he does not recall giving Agent Soika *any* specifics about the alleged use of the Office for "personal business ventures," (2) he did not believe his alleged disclosure was sufficiently detailed for the FBI to memorialize as a violation of federal law, (3) he did not actually tell Agent Soika that Hastert was violating federal law, and (4) he was not surprised the FBI took no action regarding the passing reference he made about Hastert.

In sum, John does not meet his burden to qualify as an "original source," and therefore this Court should dismiss this case with prejudice.

## I. BACKGROUND

### A. The Court-Ordered Jurisdictional Discovery Regarding John's Alleged Disclosures to the Government

This Court instructed the parties to conduct discovery regarding John's alleged disclosures to the Government in its August 11, 2015 ruling. (Dkt. 63.) Discussed below are the fruits of that discovery, including: (1) phone records produced by John reflecting calls with the FBI (Ex. A, B); (2) the FBI's call log and report memorializing conversations John had with the FBI in August 2011 (Ex. C); (3) a declaration by FBI Agent Soika (Ex. D); (4) sworn interrogatory answers by FBI Agent Soika (Ex. E); and (5) John's deposition testimony (Ex. F).

342142.2

The parties' thorough discovery revealed nothing other than this information about John's alleged calls.

### B. John's Phone Records Do Not Address or Corroborate the Substance of His Calls with the FBI

John produced phone records that purport to reflect the following phone calls with the FBI: August 29, 2011 (56 minutes), August 30, 2011 (27 minutes); August 31, 2011 (calls of 2 and 1 minutes, respectively), September 19, 2011 (18 minutes). (*See* Ex. A.) After his deposition, John also produced a phone record for a call on October 21, 2011 that he says he forgot to produce (indicating another 10 minute call). (Ex. B; Ex. F at 68:12-69:2.) The phone records reflect only the dates and times of alleged calls, not the substance of any call. (*See* Ex. A, B.) And John admitted that the shorter calls likely did not actually result in a conversation with anyone at the FBI. (Ex. F at 50:19-51:3; 59:14-60:11.)

### C. John's Admits that He Has No Documents, No Witnesses, or No Other Corroboration Regarding Anything He Allegedly Told the FBI

John admitted in response to Hastert's document requests (and his counsel stated in open court) that he has *no* documents that are in any way related to his pre-suit disclosures to the Government other than his phone records (which simply record the date and time of alleged calls with the FBI). (*See* Ex. F at 71:14-19.) John also testified that he was unaware of any other documents regarding his conversations with the FBI, was unaware of any other documents that corroborate his recollection that he told Agent Soika about Hastert or the Office, and never provided any documents to the Government regarding this case before he filed his suit. (*See id.* at 71:14-73:22.) John also admitted that no one was present for his calls with the FBI and that he did not recall telling anyone about his calls with the FBI. (*Id.* at 28:8-29:1; 48:5-14.)

3

### D. The FBI's Contemporaneous Records Contradict John's Recollection

The FBI produced records memorializing calls with John, which the Court previously reviewed *in camera*.[1] The first document is a call log from August 5, 2011 that states that John reported he was "involved in a child custody case" and feared "his civil rights are being violated because he is from India." (Ex. C at FBI 001 [reflecting complaint number 2011-5106].) The notes reflect that John asked to speak to an agent. *Id*. John concedes this initial call had nothing to do with Hastert or the Office, and that he did not intend to make any disclosure about Hastert during his August 5 call. (Ex. F at 29:7-30:20.)

The next document is the standard FBI Complaint/Assessment form (FD-71) prepared by Agent Soika, which reflects discussions with John on August 29 and 30, 2011 (the longest calls with John). (*See* Ex. C at FBI 002-005.) Agent Soika's detailed notes make no mention whatsoever of Hastert, business ventures involving Hastert, or the Office. (*See generally* Ex. C) The document later states the writer [Agent Soika] used "readily available public information to verify identifies of various individuals described by the complainant." It concludes with a recommended action to close the assessment, stating that "[a]t this time, no Federal Violation/Crime exists." (*See* Ex. C. at FBI 004-005.)

### E. John's Suit Against Wheaton College

Hours after John's August 30, 2011 call with Agent Soika, John filed a lawsuit in DuPage County, Illinois against Wheaton College, Megan Bolinder (the mother of John's child), her parents, and Tom Pratt, a trustee emeritus of the College. (*See* Ex. G [John's Complaint filed

---

[1] Based on its review of the FBI records, the Court found them to be "not relevant to any issue in this case" because they said nothing about any complaints by John about Hastert or the Office. (Dkt. 77.) Thereafter the FBI separately produced these documents to the parties in John's lawsuit against Wheaton College. At the April 19, 2016 status conference in this case, John's counsel disclosed that he had a copy of them (even though he is not counsel for John in the Wheaton College case) and put them at issue in this case. In response, this Court permitted use of the FBI documents in this case. (*See* Dkt. 91 at 4:10-21.)

4

8/30/11].) The suit alleged counts of Civil Conspiracy, Public Disclosure of Private Facts, Defamation, and Tortious Interference with a Business Relationship against various defendants. (*Id.*) The tortious interference count states that John had a business relationship with Hastert from 2008 through 2010, and that Wheaton College, the Bolinders, and Pratt purposefully interfered with that relationship. (*See id.*, ¶¶ 32-35.) But although the Complaint mentions Hastert and an alleged "business relationship," it contains no details about that relationship, much less allegations that suggest that Hastert misused the Office, spent Government funds on personal business ventures, or otherwise engaged in any misconduct.

F.  **Agent Soika's Declaration and Interrogatory Responses Confirm that John Never Disclosed to the FBI any Information Regarding Hastert, the Office, or Hastert's Alleged Misuse of Federal Funds**

Consistent with the FBI's contemporaneous documents showing no discussion of Hastert, Agent Soika has provided two sworn statements confirming that John never mentioned Hastert or the Office to him—at any point in time.

In his sworn January 26, 2016 declaration, Agent Soika stated he did not recall John mentioning Hastert or the Office during any of their phone conversations. (*See* Ex. D at 5-6.) Soika characterized his conversations with John as relating to matters in Arkansas (*id.* ¶¶ 4-6), which is fully consistent with the FBI reports recording John's concerns about his child custody dispute in Arkansas.

Agent Soika's sworn interrogatory responses only further reinforce that John never disclosed to the FBI the information on which his current FCA allegations are based. For example, one interrogatory asked Soika to:

> Describe in detail every Communication between You and Relator … that related in any way to one or more of the following: (i) Hastert, (ii) the Office of the Former Speaker, (iii) the improper use of Government funds, a Government office, Government staff, and/or Government equipment, (iv) the use of a Government office, Government staff, or Government equipment for personal

5

342142.2

>business ventures; (v) the misuse of Government funds; or (vi) the false or fraudulent submission of claims to the Government for payment. If there are no such Communications, please so state.

Agent Soika's answer: "SA Soika has had no such communications." (*See* Ex. E at ¶ 1.)

Soika described a long list of facts bolstering this answer. At the time of his conversations with John in 2011, Soika had six years of experience as an FBI Special Agent, which included training in and experience regarding receiving public complaints regarding possible violations of federal law, training in and experience conducting investigations of various violations of federal law, and experience preparing reports of complaints to the FBI and/or witness interviews. (*See id.* ¶¶ 2a-c, h.) Soika used his training and experience to determine whether a complainant was complaining of potential violations of federal law. (*Id.* ¶ 2d.) Soika typically memorialized his communications with complaining parties by completing the relevant report. (*Id.* ¶ 2i.)

Agent Soika offered the following facts to confirm that if John had made the disclosures he claims to have made, Soika would have recorded them in his report: Soika was familiar with who Hastert was and that he had held a federal political office within Congress. (*Id.* ¶ 2e.) Soika also understood that an allegation that a person had submitted personal and non-Governmental expenses for reimbursement by the Government may be in violation of a federal law. (*Id.* ¶ 2g.) Consistent with this—and his considerable experience and training—Soika stated he would have likely included in his FBI reports any mention by John of (1) Hastert being involved in a possible violation of federal law or (2) the Office or any federally funded office, staff, or equipment being used for non-Governmental purposes. (*See id.* ¶¶ 2k-l.) There, of course, is no such mention in Soika's reports. (*See* Ex. C at FBI001-005; Ex. E ¶ 2l [stating that the FBI reports contain no reference to Hastert, the Office, or any alleged improper use of a federally funded office, staff, or equipment].)

6

Finally, Agent Soika believes that had John reported any form of alleged misconduct by Hastert, it is "very likely" that he would recall such an allegation today, and that it is "very likely" that such allegation would have been memorialized within the FBI report regarding such communications. (Ex. E ¶¶ 2m-n.)

G. **John's Inconsistent and Uncorroborated Accounts of His Alleged Disclosures Do Not Meet His Burden of Establishing that He Qualifies as an Original Source**

John's testimony has been a moving target throughout this case. To start, John's original Complaint and his First Amended Complaint did not mention any communications with the FBI about Hastert's alleged violations of federal law. Then, in his Affidavit dated February 3, 2015, John claimed that "[i]n September 2011, I had five or six telephone conversations with [Soika] [and] [o]n at least two of those conversations I informed S.A. Soika that J. Dennis Hastert was using the Office of the Former Speaker for Mr. Hastert's personal business in violation of federal law." (Dkt. 41-1.) Next, in his sworn Second Amended Complaint filed July 23, 2015, John, for the first time, asserted that he had calls with Soika in August, September, and October 2011, and that he told Soika that he had "knowledge that Mr. Hastert was using the federally funded offices, staff, office supplies and vehicles for his personal business ventures." (2d Am. Compl. ¶¶ 50-52.)

John's deposition testimony paints yet another version of the story. John testified that the brief statements in Paragraph 50 of the Second Amended Complaint reflect his complete memory about the general substance of his conversations with Soika, namely that he said something about Hastert using the Office for personal business ventures. (*See* Ex. F at 61:16-24 ["Q: So the complaint, in particular paragraph 50 here, represents your complete memory about what you told Agent Soika about Hastert and the office of the former speaker? A: That's

7

correct."); 91:14-21 ["Q: The statements in paragraph 50 are not actual quotes of things that you recall telling Agent Soika? A: Correct."]).

Even in John's mind these general statements were not specific enough to put Soika on notice of a potential violation of federal law:

> It's my understanding that it's frequent that complaints are received about world leaders . . . [a] lot of people either with no information of crazy information. So I don't know that what I reported necessarily met the level of specificity he needed to memorialize it.

(*See* Ex. F at 85:24-86:6.) Indeed, John repeatedly testified that his alleged disclosures about Hastert only "implicitly" suggested a violation of federal law. (Ex. F at 62:1-14.)

John's incredible account of how he came to believe that Hastert had violated federal law further weakens his case. John says he came to believe that Hastert was violating federal law when someone—John does not recall who—told him sometime before August 2011 about the Office of the Former Speaker statute (the "Statute"). (Ex. F at 46:15-47:22.) John allegedly read the Statute, which led to an epiphany that Hastert was using the Office in violation of federal law. (*Id.*) John nonetheless thought the Statute was not terribly well known or understood and did not think Soika would be familiar with it. (Ex. F at 54:9-16; 58:20-24.) But despite the central role of the Statute to his case, and his belief that Soika would not be familiar with it, John never told Soika about the Statute.

Not only this, but John never followed up on his alleged complaint about Hastert's misuse of the Office, never sent the FBI the documents he had that supposedly supported his allegations, and never did anything else to confirm that the FBI understood he was complaining about Hastert's alleged violations of federal law. (*See* Ex. F at 47:20-48:4, 50:2-18; 54:9-55:4, 56:22-57:19, 58:14-24, 67:24-68:7, 91:3-92:2.)

8

## II. LEGAL STANDARDS FOR DISMISSING JOHN'S SECOND AMENDED COMPLAINT UNDER THE PUBLIC DISCLOSURE BAR

A court must dismiss any action for which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1); *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007). The public disclosure bar is a limitation on subject matter jurisdiction. *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 703 (7th Cir. 2015). Where, as here, a defendant makes a factual attack on a plaintiff's assertion of subject matter jurisdiction, it is proper for the court to look beyond the jurisdictional allegations in the complaint to determine, based on the evidence, if plaintiff has established that subject matter jurisdiction exists. *St. John's United Church of Christ*, 502 F.3d at 625; *see also United States v. Omnicare, Inc.*, 2014 WL 1458443 at *3 (N.D. Ill. Apr. 14, 2014) (Dow, J.). "Where jurisdiction is in question, the party asserting a right to a federal forum has the burden of proof, regardless of who raised the jurisdictional challenge." *Craig v. Ontario Corp.*, 543 F.3d 872, 876 (7th Cir. 2008). John must meet his burden by a preponderance of the evidence. *See Illinois Bell Telephone Co., Inc. v. Global Naps Illinois, Inc.*, 551 F.3d 587, 590 (7th Cir. 2008).

This Court has already held that John's allegations were publicly disclosed and that John's lawsuit is based on the publicly disclosed allegations. (Dkt. 43 at 23.) The only remaining question is whether John can establish that he qualifies as an "original source" of the information on which the allegations in his lawsuit are based. *See Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267 (7th Cir. 2016) (citing *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009)) (discussing three-part test for relator to establish status as an original source); *see also* 31 U.S.C. § 3730(e)(4).

Under the 2010 version of the public disclosure bar, an "original source" is someone who either (1) prior to a public disclosure has voluntarily disclosed to the Government the

9

information on which allegations or transactions in a claim are based, or (2) has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section. *See* 31 U.S.C. § 3730(e)(4).[2]

As John claims that the only disclosure he made to the Government was in his 2011 calls to Soika—and any such disclosures were indisputably narrower than, and add nothing to, the ones disclosed in the Chicago Tribune articles in November 2012— the Court's inquiry should focus on whether John can establish that he disclosed to Soika "the information on which the allegations or transactions in [his] claim are based."

## III. ARGUMENT

### A. John Does Not Meet His Burden of Establishing that He Disclosed to the Government the Allegations on Which His Claims Were Based

Discovery confirms that John cannot meet his burden of establishing jurisdiction. The only reasonable conclusion from the evidence is that John did not disclose anything about Hastert to the FBI before he filed his lawsuit, and thus does not qualify as an original source. But even if the Court were to credit the testimony of John (who has clear motives to provide testimony helpful to his case) over the records and testimony of Soika (who has no motive to be anything but fully truthful), the evidence still could not sustain a finding of jurisdiction because John's own testimony only claims a fleeting mention of Hastert and the Office, nothing close to

---

[2] Where, as here, two versions of the public disclosure bar operated as law during the period covered by the lawsuit, the Seventh Circuit has held that current version controls. *See United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 703 (7th Cir. 2015); *United Stated ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 368 (7th Cir. 2016) (noting that the 2010 Amendments to § 3730(e)(4) are not subject to the retroactivity bar and thus "should be deemed authoritative regardless of when a person claiming to be an original source acquired his knowledge.")

10

the detail required to be disclosed to the Government as a jurisdictional prerequisite to an FCA claim.

### 1. John did not make any disclosure to the FBI about Hastert or the Office of the Former Speaker

The weight of the evidence clearly falls on the side of no pre-suit disclosure by John. The sole contemporaneous accounts of John's disclosures—the FBI's reports—do not mention Hastert, the Office, or any other alleged misuse of Government funds by Hastert. (Ex. C.) The report shows careful listening and note-taking, records in detail the conversations had, and shows that Agent Soika was focused on recording any possible violation of federal law (which Soika was duty bound to do). John cannot possibly carry his jurisdictional burden in this case when the only documentary evidence—which is contemporaneous with the calls—contains no mention whatsoever of Hastert, the Office, or business ventures involving Hastert, and could not credibly be construed to reflect a disclosure to the Government of the information on which John's FCA suit is based.

And Soika's sworn testimony is that John never mentioned Hastert, the Office, or any improper use of Government funds, Government offices, Government staff, or Government equipment. Soika is also confident that had John reported any form of alleged misconduct by Hastert he would recall such allegation today and would have memorialized such disclosure within his FBI report. (Ex. E at 3-4.) Soika's report expressly states that John did not report a crime or violation of federal law. (Ex. C.) There is every reason to give great weight to Agent Soika's testimony, and none to doubt it. And as this Court previously noted, there is absolutely no reason to question Agent Soika's credibility or truthfulness. (*See* Dkt. 85 at 11.) Even John testified that he has never had any basis to question Soika's trustworthiness or credibility. (Ex. F at 62:1-14.)

Moreover, nothing corroborates John's account, and the circumstances surrounding his contact with the FBI confirm the near metaphysical certainty they had nothing to do with Hastert or the Office. John admits that his first call to the FBI had nothing to do with Hastert. John also admits, as the FBI's records report, that the primary content of his subsequent calls with the FBI were about his custody dispute in Arkansas and the alleged violations of his civil and privacy rights related thereto.

In the end, John would have this Court believe that he told a seasoned FBI agent that Hastert was violating federal law by using a federally fund office for personal business ventures and the agent did absolutely nothing about it. Not only that, but Soika didn't even bother to put it in his report, and in fact has entirely forgotten about an eyewitness's report of a violation of federal law involving the longest-serving Republican Speaker of the House in United States history who was once third in line to the Presidency.

Furthermore, John's failure to file suit for almost two years belies his claim that Hastert's alleged violations were on his mind back in August 2011 when—he admits—he was contacting the FBI about very different matters (child custody issues in Arkansas). Anyone thinking he had good grounds for an FCA claim in August 2011 would not have waited almost two years to bring it. This shows John's contention that he reported Hastert's alleged misconduct to the FBI is an after-the-fact creation to fit the needs of his FCA claims.

The evidence unequivocally favors a finding that John was not an "original source."

> **2. Even assuming John mentioned Hastert or the Office of the Former Speaker on his calls with Agent Soika, the evidence does not support the conclusion that he qualifies as an original source**

John must show, by a preponderance of the evidence, that he provided the information on which his FCA claims are based to Soika during their phone calls. The only evidence John puts forward is his four-year-old recollection of what he said to Soika. But even his own recollection

12

is nothing more than that he made a vague reference to Hastert's alleged use of the Office for personal business ventures.

Even assuming John mentioned Hastert or the Office in passing, John characterizes any such mentioned as a lacking the required specificity to be memorialized, and that it only implied a violation of law. (*See* Ex. F at 85:24-86:6, 62:1-14.). John also never mentioned the Statute to Soika even though it was central to his liability theories and he thought Soika was unfamiliar with it. (Ex. F at 54:9-16; 58:20-24.) On top of this, neither John nor the FBI took any action whatsoever to follow-up on John's "disclosure." (*See* Ex. F at 47:20-48:4, 50:2-18; 54:9-55:4, 56:22-57:19, 58:14-24, 67:24-68:7, 91:3-92:2.). All of this suggests any mention of Hastert or the Office was so fleeting that it could not, under any circumstances, meet his burden to establish jurisdiction. *See, e.g. Hockett v. Columbia HCA Healthcare Corp.,* 498 F.Supp.2d 25 (D.D.C. 2007) (finding relator did not meet burden of establishing disclosure to the government based solely on conclusory statements that were not mentioned in disclosure statements or confirmed by anyone in the government).

### 3. John's track record in prior proceedings raises material questions regarding his credibility

Given the starkly divergent testimony of John and Soika, John's credibility is plainly at issue. Thus, this Court should consider John's possible motives in bringing this action, the proceedings involving Mr. John below, and other evidence bearing on John's credibility.

1. *John v. Bolinder*, No. DR 2010-1327-6 (Benton County, Ark.). In 2010, John sued Megan Bolinder ("Bolinder") seeking custody of their child. Among other issues during this proceeding:

    a. The court quashed subpoenas issued without basis to Wheaton College's president, vice president, and two trustees for, and awarded attorneys' fees. (*See* Ex. H [Order dated 6/24/11].)

13

        b.     After an evidentiary hearing in January 2012, the court ruled, "I find that there's certainly *no credibility* in Mr. John's tax returns. . . . So I simply cannot accept those as being any kind of measure of his actual income." (Ex. I [1/4/12 Tr.] at 13 [emphasis added].)

        c.     After an evidentiary hearing in July 2012, the court ruled "You [i.e., John] live the lifestyle of a man that makes many times more than what you represent. The IRS should be climbing through your filing cabinet right now, and if they did, I anticipate there would probably be some criminal charges for somebody. *I have no belief in what you have said here today* about your income or your expenses." (Ex. J [7/25/12 Tr.] at 6 [emphasis added].)

        d.     The court held John in *criminal contempt* for failing to pay court-ordered costs and fees, and John was jailed for over a week until he paid them. (*See* Ex. K [Order dated 7/25/12]; Ex. J [7/25/12 Tr.] at 7-8.)

        e.     In 2013, the appellate court affirmed all of the rulings John challenged. *See John v. Bolinder*, 2013 Ark. App. 224.

        f.     In the course of the case, John has had nine different lawyers from seven different law firms represent him. (*See* Ex. L [list of counsel]; M [Arkansas court docket sheet].)

    2.     *John v. Wheaton College et al.*, No. 11 L 995 (DuPage County, Ill.). In the Wheaton College case discussed above, the College filed counterclaims against John for defamation, false light, civil conspiracy, and malicious prosecution. After John had violated seven court orders over a one-year period, the court, as a sanction for John's misconduct, dismissed John's claims and entered default judgment in the College's favor on its claims. (*See* Ex. N [Order dated 2/9/16]; O [2/9/16 Hrg. Tr.]; Ex. P [summary of John's discovery violations, which was attached as Ex. A to the College's brief filed 4/12/16].) During the case, John has had nine different lawyers from five different firms represent him. (*See* Ex. L [list of counsel].

    3.     *John v. Bolinder*, No. 2013 OP 74278 (Cook County). In 2013, John filed another case against Bolinder alleging abuse of their child. Cook County dismissed the action for improper venue. (Ex. Q [Order dated 7/29/13].) The Arkansas judge then considered the issues and ruled: "The Court finds there is *no credibility to the allegations alleged by Plaintiff* [i.e.,

14

John] in his Petition for Order of Protection, Cook County, Illinois that Defendant [i.e., Bolinder] or her family have abused the minor child." (Ex. R [Order dated 2/27/14], ¶ 2.).

The facts and litigation history above should lead this Court to question the veracity of John's allegations in this matter—and specifically his alleged recall of the content of phone conversations that occurred over four years ago.

## IV. CONCLUSION

The preponderance of the evidence supports only one conclusion: that John did not disclose to the Government the information on which his lawsuit was based before he filed suit. This leaves the Court without jurisdiction to hear John's FCA claims. Hastert respectfully requests that this Court grant his motion and dismiss the Relator's Second Amended Complaint and action in its entirety, with prejudice.

Dated: May 10, 2016                     Respectfully submitted,


By: /s/ Justin A. Chiarodo
Justin A. Chiarodo
Blank Rome LLP
1825 Eye Street, NW
Washington, DC 20006-5403
Telephone: (202) 420-2200
Facsimile: (202) 420-2201
Email: jchiarodo@blankrome.com

Christian Mark Poland
Bryan Cave LLP
161 N. Clark St., Suite 4300
Chicago, Illinois 60601-3206
Telephone: (312) 602-5000
Facsimile: (312) 602-5050
Email: christian.poland@bryancave.com

*Counsel for J. Dennis Hastert*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 10, 2016, I caused to be electronically filed the foregoing using the CM/ECF system, which will then send a notification of such filing to all registered users.

>Michael Kevin Goldberg
>Goldberg Law Group, LLC
>120 S. Riverside Plaza
>#1675
>Chicago, IL 60606-6101
>(312) 930-5600
>mgoldberg@goldberglawoffice.com
>
>John Joseph Muldoon, III
>Muldoon & Muldoon, PC
>10 South LaSalle Street
>Suite 2900
>Chicago, IL 60603
>(312) 739-3550
>jjm@muldoonlaw.com
>
>Kurt N. Lindland
>Assistant United States Attorney
>219 South Dearborn Street
>Chicago, Illinois 60604
>(312) 353-4163
>kurt.lindland@usdoj.gov

/s/ Justin A. Chiarodo
Justin Chiarodo

342142.2