## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

J. DAVID JOHN,
United States of America, ex rel.,

       Plaintiff and Relator,

           v.

J. DENNIS HASTERT,

       Defendant.

No. 13 C 5014
Judge Charles P. Kocoras

### MEMORANDUM OPINION

Consistent with this Court's order of July 6, 2016, an evidentiary hearing was held on February 9, 2017. The hearing was necessitated by the dispute of material facts presented by the assertions of J. David John, the Plaintiff and Relator, and the version of events as asserted by Special Agent of the FBI Douglas Soika ("Soika"), as to his contacts with John. The essential question to be decided was what was disclosed by John to Soika and whether John qualified as an original source of information to the Government in order to avoid the public disclosure bar of 31 U.S.C. § 3730.

Both John and Soika testified at the hearing and, along with the admission of some exhibits, their testimony constituted the entirety of the hearing. The parties were represented by counsel, and each of the two witnesses was subjected to cross examination in addition to their direct examinations.

The following description represents the Court's findings of fact and conclusions of law. Soika joined the FBI in August 2005 after receiving a four-year college degree from the State University of New York, graduate studies at the College of St. Rose, and service in the United States Marine Corps. He graduated from the FBI Academy at Quantico, Virginia and had, as his

1

first assignment, the Buffalo, New York division. Soika was assigned to a small office in Rochester. In December of 2008, he was transferred to the Chicago office and, in 2011, assigned to the Lisle FBI office.

The evidence established that John contacted the Chicago FBI office by phone on August 5, 2011 and spoke to Patricia Chrasika. The FBI records reflect a report of that contact and what the call was about. John told Chrasika that he was born in India on 10/6/1964, and that he was currently involved in a child custody case with a woman by the name of Megan. This child was born in March of 2010, and John was scheduled to go to court on 9/16/2011. John said he feared that his civil rights were being violated because he was from India. John said he lived in Burr Ridge and wanted to speak to an agent. The report states that John was given an address to the WRA (assumed to stand for Western Resident Agent) so that he could discuss this further with an agent. John was also given the phone number of the Chicago Bar Association with reference to free legal services and where John could speak to an attorney with any questions he may have. The report is silent as to Defendant Hastert and contains no reference to any misuse by him of federally funded benefits.

The next contact between John and the FBI was on August 29, 2011, when John contacted the Chicago West Resident Agent's office and spoke to Soika by telephone. Consistent with his training and established FBI procedure, Soika memorialized the conversation with a written memorandum containing four pages. Although not intended to be in verbatim form, it is a summary of the relevant matters about which John was calling to complain.

Page one of the report contains the synopsis of the complaint. It reads as follows:

"Possible corruption of a District Judge in Bentonville, Arkansas (Benton County)."

Page two of the form is headed, "Details of the Complaint." Reference in this section is made to the complaint of August 5, 2011. In addition, the following topics are described as the Complaints John made:

1.     John's involvement in a custody battle with Megan Marie Bolinder, formerly Megan Marie;

2.     An upcoming court appearance of September 15-16, 2011 in Bentonville, Arkansas;

3.     That Megan Bolinder's parents, Garth and Dixie Bolinder, threatened to "bury" John if he continues to pursue custody of the child;

4.     That Garth is a Superintendent at an Evangelical church (Mid South Conference Evangelical Covenant Church) and a ranking member of a religious/fraternal organization known as "The Fellowship," based in Washington, D.C.;

5.     John's belief that his federal rights to privacy of his student education records were violated because the Bolinder family illegally acquired John's records from Wheaton College;

6.     That the Bolinders met with Tom Pratt, a trustee at Wheaton College, and that Pratt is an associate of Garth Bolinder and a member of "The Fellowship;"

7.     That Pratt provided the Bolinders with John's academic and employment records in an attempt by the Bolinders to discredit his character to prevent John from gaining custody of his child;

8.     That on January 5, 2011, Paul Chelsea (Dean Vice President for Student Development at Wheaton College) fired John from his position as a volunteer wrestling coach;

9. That Chelsea's explanation was that Garth Bolinder told Wheaton's President to remove John because he was a man of poor moral character and had a child out of wedlock;

10. That the Bolinders sought the influence of Mike Duke (Walmart CEO and alleged "Fellowship" member) and his wife Susan Duke in an attempt to prevail or influence Judge Douglas Schrantz of the 19th Western Judicial Circuit, Division 6, Benton County;

11. That shortly after the Bolinders met with Mike and Susan Duke, John's attorney, Johnnie Rhoads (female,) informed John that she would no longer represent him;

12. That John's current attorney told him that Judge Schrantz and Rhoads once worked at the same law firm;

13. That Rhoads turned over client-lawyer privilege documents to the Bolinders;

14. That John cannot get a fair custody hearing in Arkansas because the Bolinders have and will continue to try to influence Judge Schrantz through their influential associates.

Soika provided John with contact information for the Department of Education should he wish to file a complaint against Wheaton College for violation of his right to privacy in his student records. Soika advised John that he did not see any other violations of federal law that warranted an FBI investigation. John was further advised to recontact Soika if John obtained any additional information that might suggest that the judge was involved in any type of corrupt activity.

Soika's testimony at the hearing before the Court was entirely consistent with his report of the events of August 29, 2011. Soika believed he and John spoke again on August 30, but he did not write anything because there was no violation of federal criminal law. In Soika's view, as he testified, "we were looking at it as a civil matter in his custody battle, other than, you know, potential corruption on the part of the Arkansas judge." Other than that, "there weren't any

violations of federal-alleged violations of federal-criminal law that he believed were being discussed during his conversations with Mr. John."

Notably absent from Soika's report, made contemporaneously with the events at issue, is any mention whatever of Hastert's misuse of federally provided funds for his private business dealings. Indeed, neither of the two FBI reports includes Hastert's name. In his testimony, Soika denied having <u>any</u> conversations with John about Hastert.

Soika was shown a copy of John's Second Amended Complaint and directed specifically to paragraphs 50 through 52. In those paragraphs, John alleged that he told Soika a number of specific things about Hastert and his misuse of federal funds for his office and other related items. Those paragraphs are the gravamen of John's claim to be the original source of information supplied to the FBI in support of his complaint in this case. Soika denied that John told him any of those things about Hastert, whether as stated in the complaint or "that might have sounded like that stated in different words . . ." Soika put the subject matter of his conversations with John succinctly:

"The conversation we had related to the custody battle of his child."

In relevant respects, this is what Soika testified to about whether Hastert was discussed in his telephone conversations with John:

Q.  So, other than the corruption -- the potential corruption -- matter involving the Arkansas judge, there weren't any violations of federal -- alleged violations of federal -- criminal law that you believed were being discussed during your conversations with Mr. John?

A.  That is correct.

Q.  And that includes all of the conversations you had with him; is that correct?

A.  That is correct.

Q.  And when you were having these conversations, were you aware of who Dennis Hastert was?

A.  I was -- I had a familiarization with the name, yes.  I was no -- certainly no -- expert in his history, as it has played out since then.  But I was familiar with the name being assigned to Chicago, in Illinois.

Q.  You were aware that he was a member of Congress?

A.  That is correct.

Q.  Did you discuss Dennis Hastert during any of your conversations with Mr. John?

A.  Not that I recall, no.

Q.  Did you ask Mr. John why Dennis Hastert would want to keep him quiet during any of your conversations with Mr. John?

A.  No, I didn't have any conversations about Mr. Hastert.

Q.  Did Mr. John tell you that he and Dennis Hastert were doing business together on any of your conversations?

A.  Not that I recall, no.

Q.  Did Mr. John tell you that he and Mr. Hastert had been working out of the Office of the Former Speaker in Yorkville during any of your conversations?

A.  Not that I recall, no.

Q.  Did Mr. John tell you about any personal business ventures that he was undertaking?

A.  Not that I recall, no.

Q.  Did Mr. John tell you about any personal business ventures involving Dennis Hastert?

A.  No.

Q.  Did you discuss, during any of your conversations with Mr. John, the Office of the Former Speaker?

A.  No.

Q.  Are you aware of what the Office of the Former Speaker is?

A.  I have a working knowledge, yes.

Q.  And could you just describe in lay terms what you understand that to be?

A.  Sure.

He would be the person who is in charge of the Majority Leader, if you will, in Congress.

Q.  And are you aware that -- have any knowledge of the ability for a Former Speaker of the House to maintain a federally-funded office?

A.  Not a working knowledge, no.  I am assuming, like the President, he would have some sort of, you know, stipend or some sort of an office funded up by the U.S. taxpayer.

Q.  Did you have any discussion with Mr. John about that office during any of your conversations?

A.  Not that I remember, no.

Q.  Did Mr. John tell you that Mr. Hastert was using the office for private business dealings?

A.  No.

Q.  Did Mr. John tell you that Mr. Hastert was using office supplies, staff and vehicles for personal business ventures --

A.  No.

7

Q.  -- during any of your conversations?

A.  No.

Q.  Did he mention Lisa Post to you during any of those conversations?

A.  No.

Q.  Did he discuss any of people working in the Office of the Former Speaker?

A.  No.

Q.  Based on our discussion here and your view of these records, do you believe that Mr. John, during any of your conversations, had any discussion with you or you with him regarding Dennis Hastert?

MR. MULDOON:  Objection, Judge, to foundation.

THE COURT:  No, he may answer.

THE WITNESS:  I am sorry, Judge?

THE COURT:  You may answer the question.

BY THE WITNESS:

A.  Yes, I think -- I don't recall any conversations at all where Mr. Hastert's name came up. If Mr. John had somehow slipped something in, where he said, "By the way, Mr. Hastert is a friend of mine," I wouldn't have written that down in my complaint because there is no violation of criminal -- federal criminal -- law there.  So, no.

THE COURT:  Can I interrupt you there?

Are you just surmising that if that would have happened, you would not have recorded that, but you have no recollection of that happening?

THE WITNESS:  No, Judge.  What I am saying is if there was a vague reference to Mr. Hastert, from the perspective of, "Hey, by the way, do you know that Mr. Hastert is a good friend of mine," I wouldn't have -- I would not have -- recorded that.

THE COURT:  But my question to you is whether – you said if there was such a vague reference.  Do you have any recollection of any such reference?

THE WITNESS:  No, absolutely --

THE COURT:  That is my question.

THE WITNESS:  Absolutely no recollection.

Q.  And, again, based on all the information we have talked about today, do you believe that Mr. John had advised you of a potential violation of federal law involving Dennis Hastert?

A.  No.

Q.  If Mr. John had disclosed to you information along the lines of what I have just asked you about -- that Mr. Hastert was using the Office of the Former Speaker for personal business ventures -- would you have memorialized this in this report?

A.  Yes.  If there was a violation or a potential violation of federal criminal law, absolutely.

Q.  And if he told you that on a later call -- a call that had taken place after you finished this report -- would you have a note of it?

A.  Yes.

Q.  In this report?

A. No. I would have gone to my supervisor and, like I said, advised him that there was an allegation of a violation of federal criminal law and we needed to, you know, either revise this FD-71 here or generate a new one.

In an affidavit filed with this Court on May 24, 2016, John averred that he had five or six telephone conversations with Soika in September 2011 and that, on at least two of them, told the agent that Hastert was using the Office of the Former Speaker for Hastert's personal business. At the hearing before the Court, John testified that he had spoken to Soika for the first time on August 29, 2011 for close to an hour by telephone, with a follow-up conversation on August 30, 2011. He testified to having further follow-up conversations on September 19 and in October with Soika. In one of his answers on direct examination at the hearing, John testified that the primary reason for contacting the FBI was his litigation with Wheaton College, which had two parts to it: the disclosure of records to the Bolinder family and the interference with his business relations with Hastert. John testified that his initial contact with the FBI did not include topics he wished to discuss because he was going to be referred to a different office.

Prior to ever talking to Soika, John testified that he had formed the belief that Hastert had misused the Office of the Former Speaker by pursuing personal business matters with others, including himself. In paragraph 50 of his Second Amended Complaint, John alleged that he told Soika among other things, that John "had knowledge that Mr. Hastert was using federally funded offices, staff, office supplies and vehicles for his personal business ventures." Contrary to this explicit expression of illegality on Hastert's part, John testified that this was not a verbatim conversation he had with Soika, irrespective of when it took place.

John was pressed repeatedly to tell the Court what the substance of the conversation with Soika was. Rather than attempting to describe the exchange, this is what John told the Court:

THE COURT:  All right.

I want to ask you a couple of questions to clarify things in my own mind.

As I understand it, in Paragraph 50 of the amended complaint you are not asserting that this is a verbatim conversation you had with Agent Soika; is that right?

THE WITNESS:  That is correct.

THE COURT:  But that is -- what you have here is -- what you recall to be the substance of the conversation?

THE WITNESS:  Correct.

THE COURT:  I want you to tell me, as best as you are able, what words you think you may have used in communicating to Agent Soika that Mr. Hastert was using federally-funded offices, staff, office supplies and vehicles for his personal business ventures.

What words did you say to communicate that and when, during the course of the conversation, was this asserted?

THE WITNESS:  When I was telling Agent Soika about the Wheaton College litigation, I was explaining the business I was doing with Dennis Hastert.

THE COURT:  And what did you explain to him by way of the business you were doing with him?

THE WITNESS:  I just told him that we were doing one deal out in California and, then, two deals in the Middle East in --

THE COURT:  Did you tell him the nature of the deals?

THE WITNESS:  I had mentioned, at a very high level, that it was sports-related; and, then, that California was a racetrack.

THE COURT:  And what was Agent Soika's reaction to that?

11

THE WITNESS:  To?

THE COURT:  To the fact that you were in these relations -- this business relationship -- with Mr. Hastert?

THE WITNESS:  He didn't react to that.

THE COURT:  At all?

THE WITNESS:  No.

THE COURT:  And what did you tell him about the use of Mr. Hastert's office for these transactions or ventures?

THE WITNESS:  I --

THE COURT:  What words did you use to communicate that?

THE WITNESS:  I said all of my contact was with his office in Yorkville.

THE COURT:  And what did you say to him as regards that these were personal business ventures and he was using federally-funded offices and staff for that purpose? How did you communicate that idea to Agent Soika?

THE WITNESS:  Well, there was -- what I said was – I described what we were doing and that I would meet with him and I would talk to him and his personnel in that office and -- but I don't recall that my explicit words were that there was a federal violation.

THE COURT:  Well, did you somehow communicate the knowledge -- your personal knowledge -- to Agent Soika that the office was federally-funded and the staff, supplies and vehicles were, essentially, federally-funded?  Did you communicate that concept to Agent Soika?

THE WITNESS:  Only inasmuch as it was the Office of the Former Speaker and that he was using it for personal -- personal -- business.

I don't --

THE COURT:  You say you had knowledge that these were federally-funded offices -- that this was a federally-funded office?

THE WITNESS:  Yes.

THE COURT:  Did you impart that knowledge to Agent Soika?

THE WITNESS:  No.  I only said it was the Former Speaker's Office.  So, I took it to be implicit that it was federally-funded.

THE COURT:  You took it that it would be implicit to the agent that it was federally-funded or he knew that or what did you take to be implicit?

THE WITNESS:  Because it was -- it was -- funded by the House of Representatives, that he would know that.

THE COURT:  And what was Agent Soika's reaction to your expectation that he would know it was federally-funded and this was being used for personal business ventures?  Did he react to that?

THE WITNESS:  No.

THE COURT:  Not at all?

THE WITNESS:  No.

THE COURT:  Did you tell him anything about you think this may be a violation or a misuse of funds?

THE WITNESS:  I didn't ask him.

THE COURT:  Did you tell him?

THE WITNESS:  No.

THE COURT:  Why did you not tell him that?

13

THE WITNESS:  Well, when I said that he was using his -- a -- government office for private ventures, that's -- that's -- basically, all I thought I had to say.

The testimonies of John and Soika cannot be reconciled. Agent Soika testified in a straightforward manner and was consistent in his narration. He was corroborated by an FBI document created around the time of the events being memorialized thereby. Soika was an objective witness with no motive to lie and with no interest in the outcome of the case.

Soika testified that he did not write any reports about conversations he later had with John on August 30 and the two in September and/or October because there was no violation of federal law or a potential violation of federal law. If there had been, Soika would have had to revise the report he had prepared or generate a new one. Soika's failure to do so corroborates his testimony that he had no discussions with Mr. John about Mr. Hastert and any potential misuse of federal funds in connection with Hastert's private business interests and pursuits.

John's testimony strains credulity. When first speaking to Soika – the first law enforcement agent he is complaining to in Chicago – about the matters troubling him, no detail known to him, or surmise he is engaging in, is too small or insignificant to tell the agent. When he is asked at the Court hearing to describe the manner in which he supposedly complained to Soika about Hastert, he is unable to do so. Although statements John previously filed with this Court in support of his Complaint and affidavit are highly specific, he testified at the hearing that is not what he told Agent Soika. When pressed at the hearing about what he said to Soika, he said he met at the former Speaker's office and he took it to be implicit that the agent would know it was a federally funded office that was being used for personal business ventures. John was apparently not troubled that Soika did not react at all to what John allegedly told Soika about Hastert.

14

John's testimony, besides clashing in its essentials with Soika's, was confusing, inconsistent, uncorroborated and implausible. He also possesses a deep bias in view of his direct pecuniary interest in the outcome of the case.

The pronounced disparity between Soika and John as witnesses, along with the August 29, 2011 written recording made of John's conversation with Soika, compels the conclusion that John never told Soika – or any other federal government official – anything about Hastert's involvement in the child custody case John was complaining about. The Court additionally finds that John never told the FBI anything about Hastert and any possible misuse of a federally funded office, car, and related other items.

For the above-stated reasons, the Court finds that Mr. J. David John was not and is not an original source of information as to former Speaker J. Dennis Hastert with regard to receipt of federal funds for an office and related items and there use for private business purposes.

The Second Amended Complaint reflecting J. David John as Relator/Plaintiff and J. Dennis Hastert as Defendant is dismissed with prejudice.

ENTER:

Charles P. Kocoras
United States District Judge

DATE: April 6, 2017

15